ALLAN ABRAHAM LEBEDUN *v.* STATE OF MARYLAND

[No. 154, September Term, 1977.]

*Decided July 18, 1978.*

The cause was argued before MURPHY, C. J., and SMITH, DIGGES, LEVINE, ELDRIDGE, ORTH and COLE, JJ.

*Bradford C. Peabody, Assistant Public Defender,* with whom was *Alan H. Murrell, Public Defender,* on the brief, for appellant.

*Stephen B. Caplis, Assistant Attorney General,* with whom were *Francis Bill Burch, Attorney General,* and *Clarence W. Sharp, Assistant Attorney General,* on the brief, for appellee.

SMITH, J., delivered the opinion of the Court. MURPHY, C. J., filed an opinion concurring in part and dissenting in part at page 283 *infra.*

Allan Abraham Lebedun (Lebedun) here seeks to overturn his conviction by a Montgomery County jury of two separate robberies and related handgun violations. He claims: (1) the trial court erred in denying his motion to suppress evidence seized from his motel room and a statement made as a consequence thereof, and (2) that it likewise erred in consolidating for trial indictments pertaining to two entirely separate incidents. We shall hold that there was no error on the first point, but there was error on the second. The Court of Special Appeals affirmed his conviction in an unreported opinion (No. 243, September Term, 1977, decided November 16, 1977). We granted the writ of certiorari that we might consider these two questions.

The first armed robbery took place on January 28, 1976, at a Montgomery County drugstore. The second took place three days later at another pharmacy located about a mile from the first. We shall develop additional facts in the process of the opinion.

## 1. Suppression of Evidence

On the evening of February 1, the day after the second robbery, Lebedun called the Arlington County, Virginia, fire department rescue squad. He sought their assistance at a motel, saying that his friend, Andrew Bodeau, appeared to be suffering from an overdose of drugs. The dispatcher promptly notified two members of the rescue squad. Immediately thereafter the police department was notified of a "possible overdose" at the motel. One of the rescue squad members testified:

> "If a call comes in that is a possible overdose, where you don't have the details, it's customary to

notify the police that our unit is responding to a possible overdose, and they dispatch a unit also to cover any situations that might arise for police action."

This witness was a full-time professional employee of the fire department with 10 years service, the last five of which had been exclusively in the rescue unit.

The firemen arrived promptly at the motel. They found Bodeau on the floor, saw Demerol tablets in the room, determined that Bodeau had taken such tablets without a prescription, and noted that the motel room was "full of all kinds of machines" and "medical or drug related items." For that reason, they verified with their radio dispatcher that police were enroute. A police officer arrived on the scene approximately five minutes after the rescue squad had been notified of Lebedun's call. This officer testified that it was police department policy that "at any time there's possibly anything that might endanger any personnel of the Fire Department, that the police ride with them and assist them if possible." He further stated that when he arrived at the scene he saw the rescue vehicle backed up to the room occupied by Lebedun and Bodeau. The front door was open, the lights on, and the curtains drawn. He walked in, without announcement, and found that one paramedic was attending Bodeau while the second was questioning Lebedun.

The police officer observed various items in the room, including some electrical appliances, all of which he suspected were stolen. He heard Lebedun say in response to the question of a paramedic that both Lebedun and Bodeau had taken Demerol. One of the paramedics called the officer's attention to two bottles of Demerol tablets, plainly marked.

The paramedics left when Bodeau refused their offer of transportation to a hospital. The police officer then advised Lebedun and Bodeau of their constitutional rights and requested them to produce a prescription for the Demerol. When they failed to do so, he arrested both men for possession of a controlled dangerous substance. Assistance was requested and a second officer came to the scene.

Lebedun was removed from the motel to the Arlington County Police Department. There a magistrate read to him a form listing his constitutional rights. Ultimately, after an interrogation, Lebedun admitted to the robberies of the two pharmacies involved in this case. Thereafter, pursuant to a search warrant, the motel room was entered and a large quantity of drugs, two ski jackets, and two ski masks were seized.

Lebedun here contends that the trial court erred in denying his motion to suppress the evidence seized from the motel room and the statement made as a result of his arrest and the subsequent search.

The area of warrantless searches has been a particularly unsettled facet of the law. *See* Bacigal, *The Emergency Exception to the Fourth Amendment,* 9 U. Rich. L. Rev. 249 (1975); Irons, *The Burger Court: Discord in Search and Seizure,* 8 U. Rich. L. Rev. 433 (1974); LaFave, *Warrantless Searches and the Supreme Court: Further Ventures Into the "Quagmire,"* 8 Crim. L. Bull. 9 (1972); and Mascolo, *The Emergency Doctrine Exception to the Warrant Requirement Under the Fourth Amendment,* 22 Buff. L. Rev. 419 (1973). *See generally* J. Israel & W. LaFave, *Criminal Procedure in a Nutshell* § 14 at 119-49 (2d ed. 1975).

Professor Bacigal points out:

> "The fourth amendment consists of two conjunctive clauses: the reasonableness clause, which protects against unreasonable searches and seizures, and the warrant clause, which prescribes conditions for the issuance of a warrant. The proper relationship between these two clauses has been the subject of much debate centering on whether the clauses are dependent or independent of each other." 9 U. Rich. L. Rev. at 257 (footnote omitted).

More recently in *Marshall v. Barlow's, Inc.,* 436 U.S. 307, 98 S. Ct. 1816, 56 L.Ed.2d 305 (1978), Mr. Justice Stevens indicated in his dissent that the clauses are independent:

> "This preconstitutional history includes the controversy in England over the issuance of general

warrants to aid enforcement of the seditious libel laws and the colonial experience with writs of assistance issued to facilitate collection of the various import duties imposed by Parliament. The Framers' familiarity with the abuses attending the issuance of such general warrants provided the principal stimulus for the restraints on arbitrary governmental intrusions embodied in the Fourth Amendment.

> '[O]ur constitutional fathers were not concerned about warrantless searches, but about overreaching warrants. It is perhaps too much to say that they feared the warrant more than the search, but it is plain enough that the warrant was the prime object of their concern. Far from looking at the warrant as a protection against unreasonable searches, they saw it as an authority for unreasonable and oppressive searches . . .' [ , citing Taylor, *Two Studies in Constitutional Interpretation,* 41 (1969)].

"Since the general warrant, not the warrantless search, was the immediate evil at which the Fourth Amendment was directed, it is not surprising that the Framers placed precise limits on its issuance. The requirement that a warrant only issue on a showing of particularized probable cause was the means adopted to circumscribe the warrant power. While the subsequent course of Fourth Amendment jurisprudence in this Court emphasizes the dangers posed by warrantless searches conducted without probable cause, it is the general reasonableness standard in-the first clause, not the Warrant Clause, that the Framers adopted to limit this category of searches." *Id.* at 328, 98 S. Ct. at 1828.

The Supreme Court has at times embraced the view that the clauses are "dependent and complementary; thus making warrantless searches unreasonable except in emergency

situations when resort to a magistrate is impossible." Bacigal, *supra,* 9 U. Rich. L. Rev. at 257. Thus, in *Katz v. United States,* 389 U. S. 347, 357, 88 S. Ct. 507, 19 L.Ed.2d 576 (1967), it was asserted "that searches conducted outside the judicial process, without prior approval by judge or magistrate, are *per se* unreasonable under the Fourth Amendment—subject only to a few specifically established and well-delineated exceptions." *Accord, Coolidge v. New Hampshire,* 403 U. S. 443, 454-55, 91 S. Ct. 2022, 29 L.Ed.2d 564 (1971).

Support for the view that the Court is today thinking in terms of a broad standard of "reasonableness" as the test for searches without a warrant, and will no longer adopt a *"per se"* unreasonableness approach to warrantless searches, may be gleaned from several cases. For instance, in *Cady v. Dombrowski,* 413 U. S. 433, 93 S. Ct. 2523, 37 L.Ed.2d 706 (1973), Mr. Justice Rehnquist said for the Court:

> "The Framers of the Fourth Amendment have given us only the general standard of 'unreasonableness' as a guide in determining whether searches and seizures meet the standard of that Amendment in those cases where a warrant is not required. Very little that has been said in our previous decisions, see *Cooper v. California,* [386 U. S. 58, 87 S. Ct. 788, 17 L.Ed.2d 30 (1967)], *Harris v. United States,* [390 U. S. 234, 88 S. Ct. 992, 19 L.Ed.2d 1067 (1968)] *Chambers v. Maroney,* [399 U. S. 42, 90 S. Ct. 1975, 26 L.Ed.2d 419 (1970)], and very little that we might say here can usefully refine the language of the Amendment itself in order to evolve some detailed formula for judging cases such as this." *Id.* at 448.

In *Dombrowski* the Court upheld the warrantless search of the trunk of a car which had been towed to a service station following a wreck. The police found incriminating evidence of a murder while searching for a police officer's service revolver which the driver was thought to possess.

In *United States v. Edwards,* 415 U. S. 800, 94 S. Ct. 1234, 39 L.Ed.2d 771 (1974), the defendant was arrested for attempting to break into a post office. Investigation revealed

that there were loose paint chips on a windowsill at a wire mesh screen. The window apparently had been pryed up in an attempt to make an entry. The following morning Edwards' clothes were taken from him, held as evidence, and analyzed. Paint chips which matched the samples that had been taken from the window were found in his clothing. In *United States v. Edwards,* 474 F. 2d 1206 (6th Cir. 1973), this warrantless search had been found to violate the Fourth Amendment. The Supreme Court disagreed, "conclud[ing] that the Fourth Amendment should not be extended to invalidate the search and seizure in the circumstances of th[at] case." It noted at 802, "The prevailing rule under the Fourth Amendment that searches and seizures may not be made without a warrant is subject to various exceptions." Referring to *Cooper v. California,* 386 U. S. 58, 87 S. Ct. 788, 17 L.Ed.2d 730 (1967), the Court said at 807, "It was no answer to say that the police could have obtained a search warrant, for the Court held the test to be, not whether it was reasonable to procure a search warrant, but whether the search itself was reasonable, which it was."

In *United States v. Chadwick,* 433 U. S. 1, 97 S. Ct. 2476, 53 L.Ed.2d 538 (1977), the emphasis again was upon the reasonableness of the search:

> "As we have noted before, the Fourth Amendment 'protects people, not places,' *Katz v. United States,* 389 U. S. 347, 351 (1967); more particularly, it protects people from unreasonable government intrusions into their legitimate expectations of privacy. In this case, the Warrant Clause makes a significant contribution to that protection. The question, then, is whether a warrantless search in these circumstances was unreasonable." *Id.* at 7 (footnote omitted).

Later in *Chadwick* Mr. Chief Justice Burger said for the Court:

> "Our fundamental inquiry in considering Fourth Amendment issues is whether or not a search or

seizure is reasonable under all the circumstances. *Cooper v. California,* 386 U. S. 58 (1967)." *Id.* at 9.

However, the search in *Chadwick* was held not to be reasonable. Federal narcotics agents had arrested Chadwick and taken custody of a locked footlocker which they suspected of containing marijuana or hashish. An hour and a half after the arrest the agents opened the footlocker without Chadwick's consent and without a search warrant. The Court said, "There being no exigency, it was unreasonable for the Government to conduct this search without the safeguards a judicial warrant provides." *Id.* at 11. "With the footlocker safely immobilized, it was unreasonable to undertake the additional and greater intrusion of a search without a warrant." *Id.* at 13.

New York's Aid to Families With Dependent Children (AFDC) program, involved in *Wyman v. James,* 400 U. S. 309, 91 S. Ct. 381, 27 L.Ed.2d 408 (1971), required periodic home visits by social workers as a condition for assistance. Visitation was not permitted outside working hours and forcible entry and snooping were prohibited. At issue was whether a recipient of such assistance might, upon Fourth and Fourteenth Amendment grounds, refuse to permit such a visit without forfeiting public assistance. Mr. Justice Blackmun said for the Court in that case:

> "When a case involves a home and some type of official intrusion into that home, as this case appears to do, an immediate and natural reaction is one of concern about Fourth Amendment rights and the protection which that Amendment is intended to afford. Its emphasis indeed is upon one of the most precious aspects of personal security in the home: 'The right of the people to be secure in their persons, houses, papers, and effects . . . .' This Court has characterized that right as 'basic to a free society.' *Wolf v. Colorado,* 338 U. S. 25, 27 (1949); *Camara v. Municipal Court,* 387 U. S. 523, 528 (1967). And over the years the Court consistently has been most protective of the privacy of the dwelling. See, for

example, *Boyd v. United States,* 116 U. S. 616, 626-630 (1886); *Mapp v. Ohio,* 367 U. S. 643 (1961); *Chimel v. California,* 395 U. S. 752 (1969); *Vale v. Louisiana,* 399 U. S. 30 (1970). In *Camara* Mr. Justice White, after noting that the 'translation of the abstract prohibition against "unreasonable searches and seizures" into workable guidelines for the decision of particular cases is a difficult task,' went on to observe,

> 'Nevertheless, one governing principle, justified by history and by current experience, has consistently been followed: except in certain carefully defined classes of cases, a search of private property without proper consent is "unreasonable" unless it has been authorized by a valid search warrant.' 387 U. S., at 528-529.

He pointed out, too, that one's Fourth Amendment protection subsists apart from his being suspected of criminal behavior. 387 U. S., at 530." *Id.* at 316-17.

The Court concluded in *Wyman* that "the visit does not fall within the Fourth Amendment's proscription. This is because it does not descend to the level of unreasonableness. It is unreasonableness which is the Fourth Amendment's standard." *Id.* at 318.

One of the recognized exceptions to the general requirement that a search be made pursuant to a valid warrant in order to be valid is "the emergency doctrine." "Although the emergency exception has never been definitively explained by the Supreme Court it has been consistently recognized and applied by the lower courts to a myriad of factual situations." Mascolo, *supra,* 22 Buff. L. Rev. at 419-20. Mascolo says of the emergency doctrine:

> "The doctrine of emergency in the law of search and seizure has never been defined in terms of its overall concept. The usual practice has been for a court to tailor its definition to the circumstances of

each case. Within the context of this study, the doctrine may be defined as follows: Law enforcement officers may enter private premises without either an arrest or a search warrant to preserve life or property, to render first aid and assistance, or to conduct a general inquiry into an unsolved crime, provided they have reasonable grounds to believe that there is an urgent need for such assistance and protective action, or to promptly launch a criminal investigation involving a substantial threat of imminent danger to either life, health, or property, and provided, further, that they do not enter with an accompanying intent to either arrest or search. If, while on the premises they inadvertently discover incriminating evidence in plain view, or as a result of some activity on their part that bears a material relevance to the initial purpose for their entry, they may lawfully seize it without a warrant. Thus, to qualify as an emergency exception, there must reasonably appear to exist an exigency in the course of which a discovery related to the purpose of the entry is made. The exigent circumstances legitimate the presence, and the relevance of the discovery to the justification for the entry sanctions the seizure." *Id.* at 426-27 (footnotes omitted).

The Supreme Court has most recently applied the emergency doctrine to uphold a warrantless search to investigate the cause of a fire in *Michigan v. Tyler*, 436 U. S. 499, 98 S. Ct. 1942, 56 L.Ed.2d 486 (1978), nothing, "Our decisions have recognized that a warrantless entry by criminal law enforcement officials may be legal when there is compelling need for official action and no time to secure a warrant." *Id.* at 509, 98 S. Ct. at 1950. Approving the actions of the fire investigators, the Court stated:

"A burning building clearly presents an exigency of sufficient proportions to render a warrantless entry 'reasonable.' Indeed, it would defy reason to

> suppose that firemen must secure a warrant or consent before entering a burning structure to put out the blaze. And once in a building for this purpose, firefighters may seize evidence of arson that is in plain view. *Coolidge v. New Hampshire,* 403 U. S. 443, 465-466." *Id.* at 509, 98 S. Ct. at 1950.

The Court upheld the warrantless search by investigators who had left the scene after the fire had been extinguished and returned the following morning to collect evidence of the cause of the fire. The Court further found no necessity for a warrant even though investigators once again left the scene and returned still later the morning after the fire. In upholding these warrantless searches which took place on the day after the fire, the Court said, "[W]e find that the morning entries were no more than an actual continuation of the first, and the lack of a warrant thus did not invalidate the resulting seizure of evidence." *Id.* at 511, 98 S. Ct. at 1951. Subsequent warrantless entries occurring weeks later, however, were disapproved. *Id.* at 511, 98 S. Ct. at 1951.

The right of police to enter property during emergencies has been discussed in a number of other cases. In *United States v. Barone,* 330 F. 2d 543 (2d Cir.), *cert. denied,* 377 U. S. 1004 (1964), police officers discovered counterfeit money after entering a rooming house to investigate screams which they heard. The court said:

> "The right of the police to enter and investigate in an emergency without the accompanying intent to either search or arrest is inherent in the very nature of their duties as peace officers, and derives from the common law. See generally Read v. Case, 4 Conn. 166 (1822). Indeed it is obvious that had the patrolmen been denied entry to the apartment they would have had the right, if not the duty, to gain entry forcibly. See Wayne v. United States, supra (Burger, J., concurring)." *Id.* at 545.

Judge Burger engaged in an extended discussion of a police officer's emergency duties in that portion of the opinion in *Wayne v. United States,* 318 F. 2d 205 (D.C. Cir.), *cert. denied,*

375 U. S. 860 (1963), which was a concurring opinion and alternative holding:

"The appraisal of exigent circumstances surrounding execution of search warrants or forcible entries without a search warrant presents difficult and delicate problems. These cases do not arise in the calm which pervades a courtroom or library. They are rarely if ever seen by courts except in cases where criminal activity has been uncovered by the challenged police actions. They are not matters resolved by meditation and reflection of the participants. The events are likely to be emotion-charged, filled with tension, and frequently attended by grave risks. Neither the Constitution, statutes or judicial decisions have made the home inviolable in an absolute sense. Collectively they have surrounded the home with great protection but protection which is qualified by the needs of ordered liberty in a civilized society.

"Breaking into a home by force is not illegal if it is reasonable in the circumstances. The standards controlling a breaking in without a warrant are those prescribed in [18 U.S.C.] § 3109. Miller v. United States, [357 U. S. 301, 78 S. Ct. 1190, 2 L.Ed.2d 1332 (1958)]. But a warrant is not required to break down a door to enter a burning home to rescue occupants or extinguish a fire, to prevent a shooting or to bring emergency aid to an injured person. The need to protect or preserve life or avoid serious injury is justification for what would be otherwise illegal absent an exigency or emergency. Fires or dead bodies are reported to police by cranks where no fires or bodies are to be found. Acting in response to reports of 'dead bodies,' the police may find the 'bodies' to be common drunks, diabetics in shock, or distressed cardiac patients. But the business of policemen and firemen is *to act,* not to speculate or meditate on whether the report is correct. People could well die in emergencies if police tried to act

with the calm deliberation associated with the judicial process. Even the apparently dead often are saved by swift police response. A myriad of circumstances could fall within the terms 'exigent circumstances' referred to in Miller v. United States, supra, e. g., smoke coming out a window or under a door, the sound of gunfire in a house, threats from the inside to shoot through the door at police, reasonable grounds to believe an injured or seriously ill person ·is being held within." *Id.* at 211-12 (emphasis in original).

\* \* \*

"When policemen, firemen or other public officers are confronted with evidence which would lead a prudent and reasonable official to see a need to act to protect life or property, they are authorized to act on that information, even if ultimately found erroneous." *Id.* at 212.

Relative to an officer's purpose in responding to an emergency, Judge Burger said:

"If we could expect that patrolmen from police cruisers would be able to pinpoint the instant when they stopped treating this as a civil emergency, if they did, and began thinking of it in criminal terms, we would be asking them to resolve, under pressure and in minutes, a most subtle and delicate legal and constitutional problem on which, as we now demonstrate, judges cannot agree after months of study and deliberation." *Id.* at 212.

The last sentence referred to the sharply divided court in *Wayne*.

In *Root v. Gauper*, 438 F. 2d 361 (8th Cir. 1971), the court said:

"For purposes of the instant case, the emergency or exigency doctrine may be stated as follows: police officers may enter a dwelling without a warrant to

render emergency aid and assistance to a person whom they reasonably believe to be in distress and in need of that assistance." *Id.* at 364.

However, the court said that there was no testimony anywhere in the record indicating "that the officers in fact believed or had reasonable cause to believe that an emergency existed at time of entry," adding, "Other evidence in the record would suggest that they did not have."

In *United States v. Green,* 474 F. 2d 1385 (5th Cir.), *cert. denied,* 414 U. S. 829 (1973), a number of copper plates used for counterfeiting were discovered by a fire marshal while he was in the process of investigating the possible cause of a fire. He promptly called a Secret Service agent who proceeded to the scene immediately. The evidence was seized without a warrant. When the agent arrived firemen and trucks were still on the scene. The court at 1389 referred to "[t]he absurdity of requiring the fire investigator to secure a warrant in order to search for the fire's cause ...." In upholding the seizure by the Secret Service agent it said:

"The purpose of a search warrant is to ensure judicial authorization, in advance, of intrusions into constitutionally protected privacy. Where a lawful intrusion has already occurred and a seizure by a State officer has validly taken place as a result of that intrusion, the invasion of privacy is not increased by an additional officer, albeit a federal officer, who is expert in identifying the type of contraband discovered, to enter the premises to confirm the belief of the State officer and to take custody of the evidence. Once the privacy of a dwelling has been lawfully invaded, to require a second officer from another law enforcement agency arriving on the scene of a valid seizure to secure a warrant before he enters the premises to confirm that the seized evidence is contraband and to take custody of it is just as senseless as requiring an officer to interrupt a lawful search to stop and procure a warrant for evidence

he has already inadvertently found and seized."
*Id.* at 1390.

In *Steigler v. Anderson,* 496 F. 2d 793 (3d Cir.), *cert. denied,* 419 U. S. 1002 (1974), the court upheld a fire marshal's warrantless search for evidence of arson, observing at 796 that "a more exigent circumstance [was] difficult to imagine." *See also State v. Hardin,* 90 Nev. 10, 518 P. 2d 151 (1974), permitting a warrantless search in an emergency, and *Davis v. State,* 236 Md. 389, 204 A. 2d 76 (1964), *cert. denied,* 380 U. S. 966 (1965), to the same effect.

In *Davis* a real estate broker with whom a property had been listed for sale noticed the absence of a "For Sale" sign which should have been on the premises. He and his secretary walked to the rear yard in hopes of finding the sign. They observed a body lying under a pile of debris. They notified the nearby fire department, which responded within minutes. A police officer was present when the report came into the firehouse. He accompanied the firemen to the scene and was joined by another officer. There was a discernible trail of blood and scuffed grass leading from the place where the body was found to the back porch of the property and to the back door. When no response was received from a knock at the door, observation was made at a window and a pair of human feet were noted. Entry into the house was forced. It was the feet of the defendant which had been observed. He was found sleeping on a couch. Blood stains were apparent on the sheet upon which he was sleeping and the condition of the interior of the house indicated that a struggle had taken place. He was placed under arrest and a search of the premises was conducted. In upholding the admission into evidence of the fruit of the search, Judge Marbury said for the Court:

> "We find that the entrance of the police officers into the house was reasonable under the circumstances then existing in order to determine whether the feet which were seen therein by Lt. Denell were those of a person in distress, immediate

aid to whom might, under similar circumstances, have preserved a human life." *Id.* at 395.

The Court further said before quoting from Judge Burger's opinion in *Wayne:*

"Basic humanity required that the officers offer aid to the person within the house on the very distinct possibility that this person had suffered at the hands of the perpetrator of the homicide discovered in the back yard. The delay which would necessarily have resulted from an application for a search warrant might have been the difference between life and death for the person seen exhibiting no signs of life within the house. The preservation of human life has been considered paramount to the constitutional demand of a search warrant as a condition precedent to the invasion of the privacy of a dwelling house." *Id.* at 395-96.

The Court concluded in *Davis:*

"We find no error in the search of the house and the seizure of the evidence therein. Finding the person in the house was not in distress, the officers were justified in observing the condition of the interior of the house, the appellant lying on what appeared to be a blood stained bed sheet inside a room which showed demonstrable evidence of a bloody struggle, and from which house a trail of blood led to a body brutally beaten to death. *United States v. McDaniel,* 154 F. Supp. 1, (D. C. 1957). At this time the officers became possessed of that degree of knowledge sufficient to warrant them in the reasonable belief that the appellant had committed the felony which caused the death of the man in the back yard. *Braxton v. State,* 234 Md. 1, 197 A. 2d 841 [(1964)]; *Shorey v. State,* 227 Md. 385, 177 A. 2d 245 [(1962)]." *Id.* at 397.

A case strikingly similar to the case at bar is *United States v. Brand,* 556 F. 2d 1312, *rehearing denied,* 561 F. 2d 831 (5th

274

Cir. 1977), *cert. denied,* 434 U. S. 1063, 98 S. Ct. 1237 (1978). Judge Wisdom detailed the facts of the case for the court:

"On July 23, 1974, the Tallahassee Memorial Hospital sent an ambulance to 500 Laura Lee Drive to assist a drug overdose victim. The Tallahassee Police Department dispatched Officer George Greene to help the ambulance attendants. When Greene and the attendants entered the house, they found Charles Demetrios Brand lying unconscious on the floor of the living room. Greene testified that he saw hypodermic needles, marijuana butts, and several pills in the living room. He also heard the ambulance attendant ask Brand's wife whether her husband was on drugs. She reportedly responded that he had taken hard drugs.

"Officer Wayne Crawley arrived at the house as Brand was placed in the ambulance. Mrs. Brand and one of the defendant's brothers went to the hospital. Another brother, David Brand, remained at the house with the policemen. Crawley also reported seeing hypodermic needles and pills in the living room when he first entered. He and Officer Greene then apparently walked into one of the bedrooms where they found more hypodermics, pills, powdered substances, and blood stains around a table and on a needle. Crawley said he did not investigate the scene further but instead called a narcotics investigator, Walter Beck to the scene.

"Beck testified that numerous pills, pill bottles, injection bottles, and syringes were on the table in the living room of the house when he arrived. He spoke with David Brand, who said that his brother had probably reacted to the cocaine that they had been shooting. David also reportedly said that the cocaine was part of a shipment his brother had just received and stored in the attic of the house. Beck then called Sergeant George Greene, who directed that the house be secured and that Beck obtain a search warrant." *Id.* at 1314 (footnote omitted).

The court noted that the medical emergency ended when Brand was placed in an ambulance as a second officer arrived on the scene. *Id.* at 1317 n. 8. The court nevertheless upheld the search which took place subsequent to the second officer's arrival:

"The defendant argues first that only Officer Greene entered the house legally. When he assisted the ambulance attendants, Greene's presence in the house was permitted by the exigent circumstance of the medical emergency. According to Brand, however, officers who entered subsequently cannot justify their presences with the same exigent circumstance because the medical emergency ended prior to their arrivals. Consequently, he suggests that Sergeant Greene and Officers Beck and Crawley illegally entered the house, thereby tainting the information they gathered for the probable cause affidavit.

"We reject the defendant's contention because it misconceives the nature of the fourth amendment interest at stake. The amendment protects the citizen against invasion of privacy. Once that interest is invaded legally by an official of the State, the citizen has lost his reasonable expectation of privacy to the extent of the invasion. As this Court has held repeatedly, additional investigators or officials may therefore enter a citizen's property after one official has already intruded legally. *E. g. United States v. Green,* 5 Cir. 1973, 474 F.2d 1385, 1390, *cert. denied,* 414 U.S. 829, 94 S.Ct. 55, 38, L.Ed.2d 63; *United States v. Herndon,* S.D. Fla. 1975, 390 F.Supp. 1017, *aff'd,* 5 Cir. 1976, 536 F.2d 1027; *see Steigler v. Anderson,* 3 Cir. 1974, 496 F.2d 793, 797-98, *cert. denied,* 419 U.S. 1002, 95 S.Ct. 320, 42 L.Ed.2d 277. Later arrivals may join their colleagues even though the exigent circumstances justifying the initial entry no longer exist. *Id.* Thus, the validity of the affidavit is not vitiated

by the late entry of the affiant and the other policemen." *Id.* at 1317-18 (footnotes omitted).

The similarity of facts makes this opinion highly persuasive in the case at bar.

In Professor Bacigal's article, *supra,* 9 U. Rich. L. Rev. 249, he points out that even a strict view of the warrant clause does not mean that warrantless searches are always unconstitutional, saying, "It only means that when it is practical to do so the police must obtain a warrant before conducting a search." *Id.* at 265. Under his view a strict application of the warrant clause would be as follows:

"When the warrant clause is applicable, a warrantless search is constitutional only if the government can meet two separate tests. First, was there a legitimate government interest in searching, sufficient to prevail over the right to privacy? There is no need to distinguish an emergency search from an emergency intrusion, because the government's interest in criminal investigation and the interest in protecting life are both legitimate interests, and, if based on a reasonable belief, probable cause to search exists. At this point the government interest must be identified as legitimate and reasonable, but there is no need to further categorize the interest as civil or criminal investigation. The second test the government must meet is whether there were grounds for bypassing the warrant procedure. Under *Camara* the only ground for bypassing the warrant procedure is when 'the burden of obtaining a warrant is likely to frustrate the governmental purpose behind the search.' There is no need to distinguish an emergency search from an emergency intrusion because the likelihood of frustrating the search does not turn upon the nature of the government's purpose. Whether the purpose of the search is to obtain incriminating evidence or to preserve life, the purpose is frustrated only when the delay to obtain a warrant would make a

subsequent search meaningless. That is, in the time required to obtain a search warrant, some event (*e.g.*, destruction of sought after evidence, or loss of an imperiled life) will occur which will make the search fruitless. Thus the only proper justification for bypassing the warrant procedure is when the government can establish that the *sole* way to have accomplished its purpose (be it criminal investigation or some other legitimate interest) was to have acted immediately, and that obtaining a warrant precluded immediate action." *Id.* at 264 (emphasis in original) (footnotes omitted).

It would seem that in the present case the State easily would be able to meet even the strict construction of the Fourth Amendment.

Application of the Bacigal analysis would unfold as follows in this case: (1) An emergency situation justified a search, and therefore would have satisfied the requirement of probable cause. *Id.* at 263 n. 68. (2) The purpose would have been: (a) To protect the rescue squad which was entering an unknown environment which, in the case of overdose problems, could well involve illicit drugs; and (b) to investigate possible criminal activity. (3) If illicit drugs were to be discovered by the rescue squad, their status as potential adverse witnesses to those present might endanger the personal safety of the rescue squad. (4) Further, assuming the rescue squad reported the discovery of contraband, the delay required to obtain a search warrant would permit easy destruction of the evidence via plumbing or otherwise. Therefore, the emergency situation justified the intrusion, and the time constraint excused the necessity of a warrant. *See Michigan v. Tyler,* 436 U. S. 499, 98 S. Ct. 1942; and *United States v. Curran,* 498 F. 2d 30, 35 (9th Cir. 1974).

The suggestions of a proper police purpose of assisting the rescue squad are not purely fictional, as is demonstrated by the inter-departmental memorandum introduced into

evidence by Lebedun at the suppression hearing. It requires as standard operating procedure:

> "F.A.H. will automatically request a P.D. unit to respond on any of the following incidents:
>
> "1. ...
>
> "2. Whenever F.A.H. personnel suspect foul play or need of a P.D. unit, i.e., gunshot injuries, assaults, auto accidents, dog bite cases, overdoses, D.O.A., etc."

Given that the police officer's presence in the motel room was reasonable in light of the exigent circumstances, it follows under the plain view doctrine that the arrests and seizures were valid. *See United States v. Morell,* 524 F. 2d 550 (2d Cir. 1975), holding that the "inadvertence" required by *Coolidge* applies only to *planned* warrantless seizures:

> "It is not disputed that once inside the apartment Agent Scharlatt discovered the cocaine in plain view as he was returning upstairs from the basement. However, the appellants contend that the 'plain view' exception to the warrant requirement is inapplicable in this case because the discovery of the heroin was not inadvertent, as the plurality opinion in *Coolidge v. New Hampshire,* 403 U.S. 443, 469, 91 S.Ct. 2022, 29 L.Ed.2d 564 (1971), requires. Apart from any question as to the precedential force of the plurality opinion, *see United States v. Santana,* 485 F.2d 365, 369-70 n.8 (2d Cir. 1973), *cert. denied,* 415 U.S. 931, 94 S.Ct. 1444, 39 L.Ed.2d 490 (1974), this contention is without merit. As this court observed in *United States v. Lisznyai,* 470 F.2d 707, 710 (2d Cir. 1972), *cert. denied,* 410 U.S. 987, 93 S.Ct. 1516, 36 L.Ed.2d 184 (1973), *Coolidge* dealt with a *planned* warrantless seizure." *Id.* at 555 (emphasis in original).

## 2. Consolidation for Trial

This trial took place prior to July 1, 1977. Hence, the matter of joinder and severance was covered by then Maryland Rules 734 and 735, identical for all practical purposes with present Rule 745, subsection c of which provides in pertinent part:

"If it appears that any party will be prejudiced by the joinder for trial of counts, . . . the court *may*, upon its own motion or the motion of any party, order separate trials of counts, . . . or grant any other relief justice requires." (Emphasis added.)

In *McKnight v. State*, 280 Md. 604, 607-612, 375 A. 2d 551 (1977), Judge Levine thoroughly and carefully discussed for the Court the background of the rule and the varying holdings under its counterpart, Fed. R. Crim. P. 14. He concluded by saying for the Court:

"We think that a defendant charged with similar but unrelated offenses is entitled to a severance where he establishes that the evidence as to each individual offense would not be mutually admissible at separate trials." *Id.* at 612.

In *McKnight* Judge Levine quoted from C. McCormick, *Evidence* § 190 (2d ed. 1972) relative to the signature exception providing for the admissibility of evidence of other crimes. The description of that exception has relevance here:

"To prove other like crimes by the accused so nearly identical in method as to earmark them as the handiwork of the accused. Here much more is demanded than the mere repeated commission of crimes of the same class, such as repeated burglaries or thefts. The device used must be *so unusual and distinctive* as to be like a signature." *Id.* at 449 (emphasis added) (footnotes omitted).

Still more recently in *Cross v. State*, 282 Md. 468, 386 A. 2d 757 (1978), Judge Digges discussed for the Court when evidence of another crime may be introduced at the trial of

an unrelated offense under the common scheme or plan exception:

> "As a general rule, in order to gain the admission of evidence of other criminal acts under the common scheme or plan exception it is necessary that the crimes, including the crime charged, so relate to each other that proof of one tends to establish the other. *Westcoat v. State,* 231 Md. 364, 368, 190 A. 2d 544, 546 (1963); *Wilson v. State,* 181 Md. 1, 3, 26 A. 2d 770, 772 (1942); *see Young v. State,* 152 Md. 89, 91-92, 136 A. 46, 47 (1927). Moreover, there must be 'not merely a similarity in the results, but *such a concurrence of common features that the various acts are naturally to be explained as caused by a general plan of which they are the individual manifestations.*' 2 J. Wigmore, *Evidence* § 304, at 202 (3d ed. 1940) (emphasis in original). The concurrence of common features under this exception, however, must be more than simply a manner of operation, which is possessed to some extent by most criminal recidivists. A method of operation is not, by itself, a common scheme, but merely a repetitive pattern. *People v. Fiore,* 34 N.Y.2d 81, 312 N.E.2d 174, 178, 356 N.Y.S.2d 38, 44 (1974). Thus, evidence of other crimes can be introduced under the common scheme exception only when the relationship between the time, place, circumstances or parties involved in the crimes is such that the uncharged crime or crimes 'support the inference that there exists a single inseparable plan encompassing both the charged and uncharged crimes, typically, but not exclusively, embracing uncharged crimes committed in order to **effect the primary crime for which the accused has** been indicted.' 312 N.E.2d at 177, 356 N.Y.2d at 42-43." *Id.* at 475-476.

The similarities between the offenses here, aside from the

fact that the respective pharmacies were located in the same general area, are as follows:

| APOTHECARY | GOVERNOR'S |
|---|---|
| January 28, 1976 | January 31, 1976 |
| 3:00 or 3:30 PM | late afternoon |
| two white males | two white males |
| both about 5'10" | both about six feet |
| one app. 140 lbs; other 165 lbs. | both medium build |
| both wore red ski caps | both wore red ski caps |
| specific drugs and money taken | specific drugs and money taken |
| money and drugs were put into "a cloth sack" | money and drugs were put into a "white laundry type bag" |
| victims told to "play it cool" | victims advised to "be cool" |

The differences were as follows:

| APOTHECARY | GOVERNOR'S |
|---|---|
| both wore red "windbreakers" | both wore sheepskin jackets |
| both wore jeans | one wore blue doubleknit slacks |
| both had guns | only one had a gun |
| one had a mustache | both clean shaven |
| faces uncovered | both wore sunglasses |

There is nothing particularly unusual or distinctive about red ski caps. They are seen frequently. Nor is there anything distinctive about the fact that two white males of medium build five feet ten to six feet in height conduct a robbery in the afternoon. The fact that specific drugs and money were taken, that they were put into "a cloth sack" or a "white laundry type bag" and the victims were told to "play it cool" or advised to "be cool" comes much closer to a pattern of conduct. If, for instance, the robberies had been committed within minutes of each other, that which is set forth here might be sufficiently unusual and distinctive to be like a signature. Under the facts and circumstances here existing,

what Judge Levine said for the Court in *McKnight* is applicable:

> "Such similarities as existed here ' "fit into an obvious tactical pattern which would suggest itself to almost anyone disposed to commit a depredation of this sort." ' *United States v. Foutz,* 540 F. 2d [733,] 737 [(4th Cir. 1976)]; *Drew v. United States,* 331 F. 2d [85,] 93 [(D.C. Cir. 1964),] (robbery of two High's ice cream stores by black male wearing sunglasses); *see United States v. Carter,* 475 F. 2d 349, 350-51 (D. C. Cir. 1973) (per curiam) (two robberies and an assault in midwinter by a man wearing a fur coat and a fur hat; held insufficient similarity). *But cf. Arnold v. United States,* 358 A. 2d [335,] 338-39 [(D.C. 1976),] (each of two rapists drove light blue Volkswagen, into which he invited his victims as an act of friendly concern for an apparently innocent purpose and suddenly, without provocation, became angry and made threats because of some injury allegedly perpetrated on him or his relative by victim or one of her relatives; held sufficient similarity)." 280 Md. at 614.

We conclude that the evidence produced here to prove Lebedun's guilt of these two separate offenses would not have been mutually admissible at separate trials for the same offenses. We hold, therefore, that he was sufficiently prejudiced by the denial of his motion for separate trials relative to the two incidents to constitute that denial an abuse of discretion, and thus mandate a reversal.

> *Judgment of the Court of Special Appeals reversed and case remanded to that court with instructions to reverse the judgment of the Circuit Court for Montgomery County and to remand for a new trial; costs to be paid by Montgomery County.*

*Murphy, C. J., concurring in part and dissenting in part.*

I agree with the majority that the search and arrest were lawful, and that the incriminating statement taken from the appellant was properly admitted in evidence. I do not agree, however, that the trial judge erred in denying appellant's motion for separate trials and that that error mandates that the judgments be reversed and the appellant afforded new and separate trials as to each offense.

We noted in *McKnight v. State,* 280 Md. 604, 375 A. 2d 551 (1977) that the matter of joinder and severance of criminal trials under what is now Maryland Rule 745 is committed to the sound discretion of the trial judge. Under the rule, offenses are properly consolidated for trial where the evidence to be adduced as to each would be mutually admissible at separate trials for the same offenses, the basis being that the crimes charged are so nearly identical in method as to earmark them as the handiwork of the accused, *viz.,* that they are so unusual and distinctive as to be like a signature. *Cross v. State,* 282 Md. 468, 386 A. 2d 757 (1978); *McKnight v. State, supra; Ross v. State,* 276 Md. 664, 350 A. 2d 680 (1976); and C. McCormick, *McCormick's Handbook of the Law of Evidence* (2d ed., 1972), § 190.

As so well chronicled in the majority opinion, the robberies occurred at pharmacies in Montgomery County located approximately one mile apart, within three days of each other, during approximately the same hour of the afternoon, at gunpoint, by two white men who on each occasion demanded that specific drugs, together with cash, be placed in a bag or sack which the robbers tendered for that purpose, along with advice that the victims remain "cool" during the perpetration of the crimes. The physical descriptions of the robbers were essentially the same and on both occasions they wore red ski caps, truly a distinctive item of clothing. That one of the robbers in the first offense wore a mustache while at the second both robbers were clean shaven, is at best a weak circumstance to be considered since mustaches are so easily removed; had one of the robbers had the mustache at the second robbery, rather than the first, the matter of identity may well have been another matter.

The short of it is that these striking likenesses are such as plainly earmarked the offenses as the handiwork of the same individuals. In the exercise of a sound discretion the trial judge could properly so conclude. To hold on these facts that the trial judge abused his discretion in denying the motions to sever is to deliver a fatal blow to the intended flexibility of the operation of Rule 745.