# STATE OF MARYLAND *v.* ROBERT RAY JONES

[No. 7, September Term, 1978.]

*Decided January 4, 1979.*

*Alexander L. Cummings, Assistant Attorney General,* with whom were *Francis Bill Burch, Attorney General,* and *Clarence W. Sharp, Assistant Attorney General,* on the brief, for appellant.

*Michael R. Malloy, Assistant Public Defender,* with whom was *Alan H. Murrell, Public Defender,* on the brief, for appellee.

COLE, J., delivered the opinion of the Court.

Robert Ray Jones was convicted by a jury of murder in the first degree, robbery with a dangerous and deadly weapon, two charges of attempted robbery with a dangerous and deadly weapon and two charges of use of a handgun in a crime of violence. He was sentenced to a term of life imprisonment plus forty years consecutive thereto. He had seasonably made a motion for severance of the charges against him which the trial judge denied. The Court of Special Appeals reversed the trial court, 38 Md. App. 432, 381 A. 2d 317 (1978) and upon petition by the State we granted certiorari.

The sole question presented to us for review is whether the trial court abused its discretion in denying Jones' motion for severance.

We summarize pertinent parts of the evidence necessary

to our resolution of the issue. Danny Miller [1] testified that he, Jones, and James Johnson met at Miller's house on December 26, 1975 where they agreed "to do a stick-up" to make some money to buy drugs. Jones had a gun. They drove in a car operated by Johnson to Butler, Maryland but found no stores suitable for a successful robbery. Johnson then mentioned a savings and loan association on Roland Avenue in Baltimore City. The three drove to that location and Jones went into the building while the other two remained in the car. About three minutes later Jones returned to the vehicle. He mentioned something about a glass partition and said that the bank employee had fallen to the floor and activated the alarm.

Johnson then drove to Hampden because Jones wanted to rob a pharmacy on 37th Street and Falls Road. At that location, Johnson parked in a nearby alley and Jones left the vehicle. About three minutes later Jones ran back to the vehicle, jumped in the rear seat and said, "Let's go." Jones had $30.00 which he had taken from a man's wallet.

The three men then drove to Ruby's Liquors where Johnson parked in the rear of the store. Jones again left the vehicle and returned in about five minutes saying he had to shoot the man because the man tried to shoot him. Jones had over three hundred dollars which were divided among them after returning to Miller's home.

Diana Hevesy, branch manager of Heritage Savings and Loan Association, testified that on December 26, 1975 at or about 4:00 P.M., she and Linda Trueblood were sitting at Hevesy's desk in a small office which was enclosed by bullet proof glass. A man entered, pulled a gun and ordered her to open the office door. She was frightened, and dropped to the floor. She told Trueblood to hit the alarm. The man fled. She testified that Jones resembled the man. However, Trueblood positively identified Jones as the man in question and in addition selected his photograph the next day from among six to eight photographs.

---

1. Danny Miller testified against Jones in return for the State's agreement not to prosecute him for the homicide.

Catherine Baker, employed at Hampden Pharmacy testified that on December 26, 1975 at or about 5:00 P.M. she was behind the cash register when a man entered and after purchasing a pack of gum, pulled out a gun and said, "You know what this is." She positively identified Jones as the gunman. The pharmacist, Mr. Glassband, approached, and on command of Jones opened the register. The gunman took money from the register, a wallet from Mr. Glassband and left the store. Glassband also positively identified Jones as the gunman.

Mildred Sentz, employed by Manuel Caulker, owner of Ruby's Liquors located at 30th Street and Greenmount Avenue, Baltimore, Maryland, testified that on December 26, 1975 at or about 6:30 P.M., a man entered the store to purchase some cigarettes. As she was about to hand him the cigarettes from behind a bullet proof glass window, the man pointed a gun and asked for money. She got behind a desk and Caulker, who was nearby, jumped up and moved towards the window. Sentz heard the sound of the owner attempting to fire a gun. She then heard a loud noise and saw Caulker fall, bleeding from the chest and head. She did not see the gunman leave. Within minutes a policeman entered and Sentz informed him of what had happened. She positively identified Jones as the gunman.

Officer Michael Baptist of the Baltimore City Police Department testified that on December 26, 1975 at or about 6:30 P.M. he arrived at Ruby's Liquors to purchase some package goods. When he was approximately fifteen feet from the front door he saw a white male whom he positively identified as Jones emerge from the store and proceed in a northerly direction. The officer did not accost Jones because he had no reason to do so at that time. Upon entering the store, the officer saw a body in a puddle of blood behind the counter. Sentz told him what had happened.

Officer William Nash of the Lynchburg, Virginia Police Department, having been notified that Jones was wanted and was scheduled to arrive on a bus in Lynchburg on December 28, 1975, arrested Jones and from his person recovered

Glassband's wallet. Jones did not testify or offer any evidence.

The State presents a two fold argument. First, it contends that Jones did not establish that the evidence as to each individual offense would not be mutually admissible at separate trials. On the contrary, the State asserts that the evidence as to each individual offense would be mutually admissible at separate trials to show a common scheme or plan. According to the State, the evidence establishes a similar if not identical pattern of criminal conduct within the same general geographical area which occurred on the same day within a period of two and one-half hours, which, together with the testimony of the accomplice Danny Miller, reveals a single and inseparable plan, bringing the evidence within our explanation in *Cross v. State,* 282 Md. 468, 386 A. 2d 757 (1978) of the rule stated in *McKnight v. State,* 280 Md. 604, 375 A. 2d 551 (1977) that "evidence of other crimes can be introduced under the common scheme exception only when the relationship between the time, place, circumstances or parties involved in the crimes is such that the uncharged crime or crimes 'support the inference that there exists a single inseparable plan . . . .' "

The State next argues that Jones was not prejudiced by the denial of his motion for a severance. The State cites our description in *McKnight* of the three types of prejudice to a defendant which may be caused by an improper joinder of charges:

> First, he may become embarrassed, or confounded in presenting separate defenses. . . . Secondly, the jury may cumulate the evidence of the various crimes charged and find guilt when, if the offenses were considered separately, it would not do so. At the very least, the joinder of multiple charges may produce a latent hostility, which by itself may cause prejudice to the defendant's case. Thirdly, the jury may use the evidence of one of the crimes charged, or a connected group of them, to infer a criminal disposition on the part of the defendant from

which he may also be found guilty of the other crimes charged. [280 Md. at 609.]

The State insists that since Jones presented no defenses to any of the charges against him, he suffered no disadvantage in presenting separate defenses. The State also argues that the jury could easily compartmentalize evidence of the separate charges because the crimes occurred at separate points in time and at separate locations.

Jones' argument on appeal is also two-pronged. First, he asserts that the Court of Special Appeals was correct in ruling that the common scheme or plan exception is inapplicable to the instant case. Jones insists that a "plan" to go out and rob someone to obtain money was an undertaking neither specific nor complex enough to justify application of the exception. Furthermore, Jones argues that even if the testimony of Miller showed a common scheme or plan, the evidence of each of the three robberies was not relevant as evidence of the common scheme or plan because the robberies took place at different locations and had different victims; there was no evidence that they were planned ahead of time; and there was evidence that each succeeding robbery attempt was decided upon and undertaken only after the preceding one had been completed. The fact that the robberies occurred within a fairly short time period is insignificant, according to Jones.

Secondly, Jones contends that the State showed no need for the mutual admission of evidence of the three armed robbery incidents sufficient to outweigh the prejudice to Jones by their admission. Jones argues that the State had no need whatsoever to have evidence of the three robbery incidents mutually admitted because Miller's testimony showed the existence of a "plan" to commit robberies. With regard to possible prejudice, Jones states that the jury may indeed have considered the cumulated evidence of each robbery in deciding whether Jones' participation in the other robberies had been proven. In addition, Jones argues that he may have been prejudiced by the hostility aroused by the other crime evidence which indicated that his character was that of a hardened professional criminal. For these reasons, Jones

urges us to affirm the Court of Special Appeals' holding that the trial court improperly denied a severance in this case.

As a general rule, it is error to admit evidence of other offenses independent of the particular crime charged. *Ross v. State,* 276 Md. 664, 350 A. 2d 680 (1976); *Harrison v. State,* 276 Md. 122, 345 A. 2d 830 (1975); *MacEwen v. State,* 194 Md. 492, 500, 71 A. 2d 464 (1950); *Young v. State,* 152 Md. 89, 91, 136 A. 46 (1927); *Weinstein v. State,* 146 Md. 80, 88, 125 A. 889 (1924); 1 H. Underhill, *Criminal Evidence,* § 205 (5th Ed. 1956). The reason for the rule is obvious; such evidence may merely show bad character, improperly prejudice the jury, or unfairly surprise the accused in his defense at trial. *See generally,* C. McCormick, *Evidence,* § 190 (2d Ed. 1972).

To avoid these pitfalls during the course of trial, we have charged the trial judge with the responsibility of exercising his discretion as to whether a severance should be granted by balancing the need to avoid prejudice to the defendant against the need to promote economy and efficiency in the administration of justice. We set forth the standard to be followed in Maryland Rule 745 c:

> If it appears that any party will be prejudiced by the joinder for trial of counts, charging documents or defendants, the court may, upon its own motion or the motion of any party, order separate trials of counts, charging documents or defendants, or grant any other relief justice requires.

Further, we recognized certain exceptions to this general exclusionary rule in order to allow evidence of other criminal acts to be introduced for a purpose *other than* to show the criminal character of the accused:

> [E]vidence of other crimes may be admitted when it tends to establish (1) motive, (2) intent, (3) absence of mistake, (4) a common scheme or plan embracing the commission of two or more crimes so related to each other that proof of one tends to establish the other, and (5) the identity of the person charged with the commission of a crime on trial. [*Ross v. State,* 276 Md. at 669-70].

We discussed these exceptions in four recent decisions. In *Ross v. State, supra,* Ross was tried on various drug-related charges where an informer testified about past sales of narcotics in which Ross allegedly participated. The State maintained that the disputed testimony was admissible as an exception to the general exclusionary rule to show intent. This Court held that the informer's testimony was inadmissible. Judge Levine stated for the Court:

> The disputed testimony here need hardly be subjected to rigid scrutiny to demonstrate its inadmissibility. Proof that the accused had previously sold narcotics perhaps as long as 15 years before the crime charged in the indictment hardly tends to establish a disposition or propensity to commit the offense alleged, let alone an intent to do so. The effect of the ruling by the trial judge was to present to the jury evidence of . . . [Ross'] . . . bad character before he had taken the stand to testify. [276 Md. at 671-72].

In *McKnight v. State, supra,* the appellant had been tried on four distinct criminal charges in one proceeding, ranging from armed robbery to the use of a handgun in the commission of a felony. McKnight was accused of participating in a series of four robberies committed during a one-month period in 1974 within the same neighborhood of Baltimore City. On each occasion, the victim was a lone male; in three of the four robberies, the victim's trouser pockets were ripped. McKnight sought review of the trial court's denial of his motion for a severance. Once again Judge Levine spoke for this Court, enunciating a test for the granting of severances under Rule 745 c: "We think that a defendant charged with similar but unrelated offenses is entitled to a severance where he establishes that the evidence as to each individual offense would not be mutually admissible at separate trials." *Id.* at 612. Judge Levine explained the reasoning behind the rule as follows: "[W]here offenses are joined for trial because they are of similar character, but the evidence would not be mutually admissible, the prejudicial

effect is apt to outweigh the probative value of such evidence." *Id.* at 610. We concluded that McKnight should have been granted a severance because evidence of the four crimes charged would not have been mutually admissible against him had he been prosecuted in separate trials. The extent to which the four crimes bore a general factual resemblance to each other did not bring them within the "handiwork" or "signature" exception to the general exclusionary rule:

> We do not think that the four crimes charged here were, under the evidence, "so nearly identical in method as to earmark them as the handiwork of the accused"; nor were they "so unusual and distinctive as to be like a signature." ... The evidence established that all four victims were solitary males, that they and appellant lived in the same neighborhood ... and that in three of the four instances the victim's trousers were ripped. Although to this extent the four crimes bore a general resemblance to each other, they were hardly impressed with appellant's signature. Unfortunately, yokings or robberies, particularly of older victims walking alone in secluded areas, are not uncommon in the urban milieu. Such similarities as existed here "fit into an obvious tactical pattern which would suggest itself to almost anyone disposed to commit a depredation of this sort." [280 Md. at 613-14 (citations omitted)].

One year later Melvin A. Cross petitioned this Court to review the admission of evidence tending to associate him with another burglary committed the same day as the burglary for which he was tried and convicted. *Cross v. State,* 282 Md. 468, 386 A. 2d 757 (1978). While Cross was being tried for the burglary of a Howard County home between 4:00 and 5:00 P.M. on Sunday, February 15, 1976, the State was also allowed to present the testimony of a Catonsville man whose home was burglarized at approximately 6:30 P.M. the same day. A light blue car had been parked near each residence

during each burglary, and Cross' 1967 blue Chevrolet had been linked to the Howard County burglary. The State argued that evidence of the Catonsville burglary was admissible to show either a common scheme or plan or Cross' identity.

Judge Digges, writing for the Court, first ruled that the evidence that a blue car was seen in front of two residences where break-ins occurred was "clearly inadequate to show any kind of systematic scheme or plan sufficient to allow admission of the evidence of the other crime." *Id.* at 476. In explaining the nature of the common scheme or plan exception, we said:

> As a general rule, in order to gain the admission of evidence of other criminal acts under the *common scheme or plan* exception *it is necessary that the crimes,* including the crime charged, *so relate to each other that proof of one tends to establish the other. Westcoat v. State,* 231 Md. 364, 368, 190 A. 2d 544, 546 (1963); *Wilson v. State,* 181 Md. 1, 3, 26 A. 2d 770, 772 (1942); *see Young v. State,* 152 Md. 89, 91-92, 136 A. 46, 47 (1927). Moreover, there must be "not merely a similarity in the results, but *such a concurrence of common features that the various acts are naturally to be explained as caused by a general plan of which they are the individual manifestations.*" . . . The concurrence of common features under this exception, however, must be more than simply a manner of operation, which is possessed to some extent by most criminal recidivists. *A method of operation is not, by itself, a common scheme, but merely a repetitive pattern.* . . . Thus, evidence of other crimes can be introduced under the common scheme exception only when the relationship between the time, place, circumstances or parties involved in the crimes *is such that the uncharged crime or crimes "support the inference that there exists a single inseparable plan encompassing both the charged and uncharged crimes, typically, but not exclusively, embracing uncharged crimes committed in order to effect the*

> *primary crime for which the accused has been indicted."* [282 Md. at 475-76 (emphasis supplied)].

We also considered and rejected the State's argument that the evidence was nevertheless admissible as tending to establish Cross' identity. Before evidence of another crime may be admitted, we said that the accused's involvement in the uncharged crime must be established by "clear and convincing evidence." *Id.* at 478. We concluded that the Catonsville homeowner's description of a blue Chevrolet parked in his driveway, his recollection of its license plate number, and a Michelob beer bottle found in tire tracks on his front yard was not clear and convicing: "[I]n fact, it was so deficient that it would not even suffice to create a jury issue were Cross being tried for any crime associated with the . . . [second] . . . incident." *Id.* at 479. Moreover, admission of the second homeowner's testimony was highly prejudicial and could not be said to constitute harmless error. *Id.* at 480.

Our most recent decision involving the exceptions to the "other crimes" rule was *Lebedun v. State,* 283 Md. 257, 390 A. 2d 64 (1978). Lebedun sought to overturn his conviction for two separate robberies and related handgun violations, associated with armed robberies of two Montgomery County drugstores: the first on January 28, 1976; the second, three days later at a pharmacy about a mile away from the first. Lebedun challenged, *inter alia,* the trial court's denial of his motion for severance because the evidence produced to prove his guilt of the two separate offenses (similarities in race, height, weight, clothing, words spoken, and items stolen) would not have been mutually admissible at separate trials for the same offenses under the "signature" exception to the "other crimes" rule. Writing for the Court, Judge Smith agreed that the denial of Lebedun's motion for a severance constituted an abuse of discretion:

> There is nothing particularly unusual or distinctive about red ski caps. They are seen frequently. Nor is there anything distinctive about the fact that two white males of medium build five feet ten to six feet in height conduct a robbery in the afternoon. The fact that specific drugs and money

were taken, that they were put into "a cloth sack" or a "white laundry type bag" and the victims were told to "play it cool" or advised to "be cool" comes much closer to a pattern of conduct. If, for instance, the robberies had been committed within minutes of each other, that which is set forth here might be sufficiently unusual and distinctive to be like a signature. [283 Md. at 281].

When we examine the State's theory in the case *sub judice* to determine if evidence of each of the individual offenses committed on December 26, 1975 would be mutually admissible at separate trials to show a common scheme or plan, *Cross v. State, supra,* is the controlling precedent. In order to gain admission under this exception it is necessary that the crimes "so relate to each other that proof of one tends to establish the other." In other words, to establish the existence of a common scheme or plan, it is necessary to prove that the various acts constituting the offenses naturally relate to one another by time, location, circumstances and parties so as to give rise to the conclusion that they are several stages of a continuing transaction.

The State argues that the record establishes a pattern of criminal conduct within a period of two and one-half hours by the same parties in the same geographical area and that this evidence suffices to show a plan under the exception. We note first of all, that mere proximity in time and location within which several offenses may be committed does not necessarily make one offense intertwine with the others. Immediateness and site are not determinative. *See State v. Buxton,* 324 Mo. 728, 22 S.W.2d 635 (1929); *State v. Beam,* 184 N. C. 730, 115 S.E. 176 (1922); *Mayes v. State,* 118 Tex. Crim. 612, 42 S.W.2d 65 (1931). Nor does the fact that the offenses were committed by the same persons qualify them to be admitted under the exception. *See Atnip v. State,* 564 P. 2d 660 (Okla. Crim. 1977):

In the instant case there is nothing to indicate that any of these crimes were connected in any manner other than that some of the burglaries were committed on the same day. Furthermore, the mere

fact that the evidence shows that the crimes were all burglaries allegedly committed by the same three persons is not sufficient to fall within this exception. Mere similarity of the alleged offenses does not, of itself, indicate common scheme or plan. Therefore, since it is apparent that the crimes were separate and unrelated, the trial court erred by admitting the evidence of prior offenses. [564 P. 2d at 663].

We repeat; there must be a causal relation or logical or natural connection among the various acts or they must form part of a continuing transaction to fall within the exception.

Reviewing the evidence in this case, it is clear to us that the fact that Jones may have robbed one of the three businesses does not establish or even tend to prove anything about the robberies at the other locations. There was no evidence which showed that in advance of the robberies Jones, Johnson and Miller had agreed that they would commit more than one robbery or that they would keep robbing until they obtained enought money to buy drugs. On the contrary, the record shows that each of the establishments robbed was selected at random or on impulse and that only after one robbery was attempted was a decision made to rob another place.

We cannot say that the robberies in question here are so related that they are inseparable and would be mutually admissible at separate trials. Accordingly, we hold that the evidence was inadequate to show a common scheme or plan. Applying the test for proper severance of offenses set forth in *McKnight, supra,* and explicated in *Cross, supra,* the trial judge's denial of the motion for severance constituted an abuse of discretion. Consequently, the cumulative effect of the eyewitness identification and other evidence as to each robbery was so overwhelmingly prejudicial that Jones is entitled to a new trial.

*Judgment of the Court of Special Appeals affirmed.*
*Costs to be paid by the Mayor and City Council of Baltimore.*