*Teshan Dion Jordan v. State*, No. 2437, September Term, 2023. Opinion by Harrell, J. Filed January 30, 2026.

**"OTHER CRIMES" EVIDENCE – MD. RULE 5-404(b) – SPECIAL RELEVANCE – IDENTITY – MODUS OPERANDI – MOTIVE – USPS "ARROW KEYS"**

In a jury trial on charges that appellant, with accomplices, robbed a USPS mail carrier at gunpoint, then used the unique "arrow key" stolen from her to commit a series of thefts from USPS mailboxes along the route linked to the stolen key, the judge did not err in admitting limited evidence that police recovered two other stolen arrow keys from vehicles linked to appellant, to prove his motive for the robbery and his modus operandi for the theft scheme. Despite the lack of any Maryland case law mentioning arrow keys, and the lack of extra-jurisdictional case law addressing admission of arrow keys under identity, motive, modus operandi, or other special relevance exceptions governing "other crimes" evidence, discovery of other stolen arrow keys in vehicles linked to appellant was specially relevant to identify him as a participant in both the charged robbery and the thefts.

Circuit Court for Howard County
Case No.: C-13-CR-22-000508

TESHAN DION JORDAN

v.

STATE OF MARYLAND

_____

Ripken,
Kehoe, S.,
Harrell, Glenn T., Jr.
        (Senior Judge, Specially Assigned),

JJ.
_____

Opinion by Harrell, J.
_____

Filed: January 30, 2026

Pursuant to the Maryland Uniform Electronic Legal
Materials Act (§§ 10-1601 et seq. of the State
Government Article) this document is authentic.



Gregory Hilton, Clerk

This contemporary tale of postal crime most foul began on 21 June 2022, when Lakesha Fowlkes, a United States Postal Service ("USPS") motor carrier assigned to the Oak Hall Road Post Office in Columbia, was delivering mail. She was robbed at gunpoint (the "Fowlkes robbery"). During the ensuing weeks, a unique USPS "arrow key" (the "Fowlkes Key") stolen from her was used in a series of mailbox thefts.

A jury in the Circuit Court for Howard County convicted Teshan Dion Jordan, appellant, of robbery with a dangerous weapon, use of a firearm in a crime of violence, theft, and related crimes committed during the Fowlkes robbery and mailbox theft scheme. At trial, the State's theory was that Jordan drove his armed accomplice, Fermon Nichols, to the site of the robbery, waited nearby, and then drove the getaway car. Jordan's motive for robbing Fowlkes was to obtain the arrow key for her route, which he used later, with another accomplice, Camron Mattocks, to steal checks from USPS mailboxes, to be sold on Telegram.[1]

Nichols, in his case, pleaded guilty to robbery with a deadly weapon, but did not implicate Jordan. Mattocks, who pleaded guilty to a theft scheme and armed robbery of a mail carrier in Baltimore County, testified under a plea agreement that, after meeting Jordan in July 2022, they continued their mail theft scheme until 31 August 2022, when they fled from police. Police recovered the Fowlkes Key from a vehicle abandoned by

---

[1] "Telegram 'is a messaging app that can be end-to-end encrypted.'" *Danshin v. State*, 491 Md. 520, 525 n.3 (2025) (quoting *United States v. Ostrander*, 114 F.4th 1348, 1356 (11th Cir. 2024)).

Mattocks and Jordan, and two other stolen USPS arrow keys (the "Other Keys") in another vehicle abandoned by Jordan.

In this appeal, Jordan contends the trial court erred in admitting evidence about the Other Keys, in violation of Md. Rule 5-404(b) limiting evidence of other crimes and bad acts to prevent verdicts predicated on evaluations of a defendant's character or propensity for criminal behavior. We conclude otherwise. The Other Keys evidence was admissible to prove Jordan's identity as a participant in the Fowlkes robbery and the mail theft scheme by establishing his motive for that robbery and his distinctive modus operandi for the thefts. Accordingly, we shall affirm Jordan's convictions.

## FACTUAL BACKGROUND

*The Fowlkes Robbery and Mailbox Thefts*

Lakesha Fowlkes testified that, at around 2:00 p.m. on 21 June 2022, she was robbed at gunpoint. After delivering mail in an office building, she returned to her USPS vehicle. A masked older man with gray hair, who had been sitting on a nearby bench, approached. Displaying a handgun, he demanded specifically that she hand over her arrow key, which is a numbered USPS key that unlocks USPS collection boxes, allowing mail carriers "to get into all of the . . . blue mailboxes[,]" "business buildings[,]" and "apartment buildings" along the mail route related to that key. According to United States Postal Inspection Service ("USPIS") Inspector Michelle Winters, each arrow key "is exclusive to each Post Office. It's accountable property and it is serialized, which means each key has a specific serial number on it. . . . [E]very morning, a letter carrier is required to sign out an arrow key before he or she leaves to deliver mail on their route."

2

After Fowlkes gave the robber her arrow key and the keys to her USPS vehicle, he walked around the building, "toward [a] 7-Eleven[.]"

In the weeks following the Fowlkes robbery, there were a series of mail thefts from Howard County mailboxes, including a large collection box outside the Oak Hall Lane Post Office. Thefts occurred "approximately once a week . . . at this specific post box[.]"

*The Investigation*

Surveillance and red-light camera footage showed that, when Fowlkes turned her USPS vehicle into the parking lot of the office building where she made her first delivery of the day, a silver Chevrolet Impala with a "unique rim style" and missing "front tag" had been "driving behind Ms. Fowlkes' mail truck from the . . . Oak Hall Post Office." As Fowlkes stopped to deliver mail inside that office building, the Impala continued through the parking lot and parked at an adjacent 7-Eleven.

When Fowlkes returned to her vehicle, a masked man approached, displayed a handgun, demanded her arrow key and the keys to her USPS vehicle. The robber walked then to the 7-Eleven and got into the passenger seat of the Impala, which drove quickly away.

USPIS and Howard County Police Department ("HCPD") investigators were unable to identify the robber, the driver, or the Impala from surveillance images. Although the license plate on the Impala was visible "in the front dashboard area on the driver's side," it turned out that those tags were reported stolen.

Shortly after the Fowlkes robbery, mail thefts began to occur at collection boxes at the Oak Hall Post Office and "several" other mailboxes "in the Columbia area" that were

3

"able to be accessed and opened by the arrow key that was stolen in this armed robbery." Thefts on June 30 and July 5 indicated "that whoever had this arrow key now was accessing post boxes and stealing mail."

Investigators installed motion-activated cameras, which recorded thefts from the large mailbox outside the Oak Hall Post Office. Thefts occurred "once a week" or more, in the early morning "off hours that people aren't usually going to these blue post boxes[.]" Vehicles identified during these thefts included (1) a silver 2012 Mercedes GLK registered to the mother of Camron Mattocks; (2) a Chevrolet Camaro rented through Enterprise by the mother of Teshan Jordan; and (3) a black 2022 Mercedes GLC registered to a woman who investigators learned was Jordan's girlfriend.

In still photos from thefts at the Oak Hall Post Office on June 30 and July 5, "there was only one suspect" in the black GLC. On July 14, however, "a second suspect" was seen for the first time, when the silver GLK arrived and "somebody [got] out of the passenger seat of" that vehicle. Images captured on July 14, July 18, July 25, and August 1 followed a pattern during which a vehicle pulled up to the mailbox, someone got out of the passenger seat, opened the mailbox with an arrow key, removed some mail, then relocked the mailbox, and drove away. When investigators "review[ed] the video[,]" "it appeared to be the same two suspects that were appearing each time[.]"

In July, police identified the silver GLK, its registered owner, and her relationship to Mattocks. At a traffic stop on 12 August 2022, Mattocks was driving that vehicle. From those records and a prior contact in which Mattocks provided his phone number, police began surveilling the silver GLK, gathering eventually enough information to obtain a

4

warrant for Mattocks's phone records, including data on calls, texts, location, and subscriber information.

Meanwhile, on August 8, when the Camaro first appeared at the Oak Hall mailbox, police determined that vehicle was rented to Jordan's mother and began "developing [Jordan] as a suspect." Through phone and social media records, police linked Mattocks and Jordan, noting that they had no phone contact "on days that the mail thefts did not occur[,]" but communicated only "around the timeframe of these mail thefts[,]" on those days not during "normal . . . middle of the day hours." The first contact between Mattocks's and Jordan's cell phone numbers was on July 12, two days before the second individual began participating in the mailbox thefts.

Through phone and social media records, police linked also Jordan with Nichols, who fit Fowlkes's description of the robber and was the regular operator of an Impala matching the one in which the robbers escaped. Jordan's Instagram account yielded numerous images of Nichols, including:

- a video posted on 16 June 2022, five days before the robbery, showing a cashier's check payable to Nichols for $24,000;

- a video posted on 17 June 2022, showing Nichols "counting a large sum of money saying, 'We're getting paid in cash'"; and

- a photo posted on 29 August 2022, showing large sums of cash.

In the early morning hours of 31 August 2022, police tracked the phones and vehicles of Mattocks and Jordan to a grocery store parking lot. As surveillance footage depicted, the black GLC parked, and the driver got into the passenger seat of the silver

5

GLK, which was driven away. Another officer trailed the silver GLK as it stopped at multiple mailboxes.

When the silver GLK returned to the grocery store parking lot, police were poised. Although the driver was identified visually as Mattocks, the passenger could not be identified because he "had his seat leaned all the way back." The silver GLK turned around and fled. Police found that vehicle abandoned at a dead-end street, along with stolen mail in nearby dumpsters. The black GLC was left at the grocery store.

After HCPD seized both abandoned vehicles, a crime scene specialist, conducting a warrant search of the silver GLK, recovered the arrow key that had been stolen from Fowlkes, on the floor next to the passenger seat. In a black bookbag on the front seat of the black GLC, she found two more USPS arrow keys, which became the focus of this appeal.

According to Inspector Winters, the silver key had a serial number ending in "692" and "was reported stolen out of McLean, Virginia on May 23rd of 2022." The other arrow key, "brown in color[,]" had "smudgy" writing that Winters could not read.

The next day, Mattocks turned himself in at the HCPD. He cooperated with investigators in February 2023, implicating Jordan in the mailbox theft scheme and pleading guilty to theft in the crimes and to armed robbery of a mail carrier in a separate case in Baltimore County.

Jordan was arrested and charged with multiple crimes arising from the robbery of Fowlkes: armed robbery, conspiracy to commit armed robbery, robbery, use of a firearm to commit a violent crime, and illegal possession of a firearm. In addition, he was charged with a theft scheme conducted in Howard County between June 21 and 31 August 2022.

During the trial, conducted over six days, the State called Fowlkes, Mattocks, Winters, experts in cell phone data, and other law enforcement witnesses, and presented hundreds of documents, as evidence of Jordan's involvement in both the Fowlkes robbery and the mailbox thefts.

The prosecution's theory was that Jordan participated in the Fowlkes robbery, as the driver of the Impala, which followed Fowlkes in her USPS vehicle from the Oak Hall Post Office to her first stop. While Nichols robbed Fowlkes at gunpoint, Jordan was parked and waiting at the adjacent convenience store. After Nichols returned to the Impala with Fowlkes's arrow key, Jordan drove away. Jordan kept the Fowlkes Key, began using it to steal from mailboxes, then recruited Mattocks to join his mail theft scheme.

In addition to cell phone, email, and Instagram records showing numerous contacts between Jordan and Nichols before and after the Fowlkes robbery, the State presented testimony from an HCPD detective (trained in cell phone data and records) that the location data for phones registered to Nichols and Jordan showed them together "[i]n the same general area" over the period when the Fowlkes robbery occurred, having traveled toward the crime scene and then away within that time frame. Cell location data for Jordan and Mattocks showed also their phones "in the Columbia area during the night of . . . August 30th into the morning of August 31st."

Similarly, cell phone evidence established Jordan's frequent contact with Mattocks during the period that mailbox thefts were occurring. Mattocks, in accordance with his plea agreement, recounted meeting Jordan in July 2022, after the Fowlkes robbery, when he

bought a check from him through Telegram. At that time, Jordan had in his possession the Fowlkes Key and was driving the black GLC registered to his girlfriend. Jordan enlisted Mattocks to steal checks from collection boxes at the Oak Hall Post Office and others located on the mail route that could be opened with the Fowlkes Key. Mattocks never talked to Jordan about how he obtained the Fowlkes Key. Mattocks did not know Nichols, meet him, nor have any phone contacts with him.

Mattocks testified that he and Jordan met up typically at an early morning hour in the parking lot of a particular grocery store, alternated which vehicle they drove to "hit the mailboxes[,]" where they were "looking specifically for checks[.]" Mattocks estimated that they did this around "seven or eight times."

On 31 August 2022, Jordan left his black GLC in the grocery store parking lot and got into the passenger seat of Mattocks's silver GLK. After Jordan used the Fowlkes Key to open multiple mailboxes, Mattocks drove back to the store parking lot. Seeing an unmarked police car blocking Jordan's vehicle, Mattocks turned his vehicle around and fled. He and Jordan abandoned the silver GLK at a dead-end street and "dumped the mail . . . in a dumpster." Mattocks called his girlfriend (at the time), who picked them up, then dropped Jordan off at the Baltimore City apartment building where he was living with his girlfriend.

The next day, Mattocks turned himself in to police in Howard County. After implicating Jordan in the mail theft scheme that began with the Fowlkes robbery, he pleaded guilty to both the Howard County mailbox theft scheme and to an armed robbery in Baltimore County. Under cross-examination, Mattocks acknowledged that arrow keys

8

could be purchased on Telegram,[2] that he knew someone who had one that opened mailboxes in Texas, and that, before he met Jordan, he was "buying checks" and had "started selling" them. He admitted also that, on one occasion in July, accompanied by another friend, he stole (without Jordan) from the Oak Hall mailbox.

An HCPD Crime Scene Section Supervisor testified about recovering the three USPS arrow keys during her warrant search of the two vehicles abandoned on August 31. In the silver GLK, she found the numbered arrow key that was stolen from Fowlkes in the area between the front passenger seat and the door. She recovered also a latent print from the passenger window, which a forensic examiner identified as a match to Jordan's known print card.

In the black GLC, inside a bookbag sitting on the front passenger seat, the investigator found two more USPS keys, along with "several different checks[.]" One key was silver and marked "USPS" with an engraved number visible on one side. The other key was marked also USPS, but the only numbers she could "make out" were "a two and four." She "did not process" any of the arrow keys "for either potential prints or DNA" because those surfaces are difficult to test.

The State presented Google searches from Jordan's account, showing inquiries about the Fowlkes robbery, other mail carrier robberies, USPS post office and mailbox locations, and information about investigatory capabilities of certain digital technology. Among these were the following:

---

[2] HCPD Detective Timothy Usher testified that purchasing an arrow key on Telegram "would . . . be easy[.]"

- 22 May 2022: "Post Office near Tysons Corner"; "United States Postal Service" at "1544 Spring Hill Road in McLean, Virginia"; and "Post Office where mail couriers leave called[?]"

- 23 May 2022: "mailbox locator"

- 28 May 2022: "USPS open tomorrow"

- 3 June 2022: "tracking device on stolen tags"

- 5 June 2022: "Fairfax mailman robbery"

- 22 June 2022: "Columbia, Maryland mail"

- 27 June 2022: "Howard County mail worker robbed" and "mail worker robbed"

- 2 July 2022: "Howard County mailman robbery"; and "mail carrier held at gunpoint, HoCo"

- 3 July 2022: "Washington Post USPS"; "Columbia, Maryland mail robbery"; and "female Columbia mail carrier robbed at gunpoint in Columbia"

- 7 July 2022: "United States Post Service"; a hyperlink "to a River Road Post Office, Potomac, Maryland"; and "the street view of that Post Office being viewed by this Google user"

- 19 July 2022: "Post Offices in Atlanta" with "hyperlinks that were viewed with the various addresses" of "different Post Offices in Atlanta, Georgia"

- 21 July 2022: "Post Office, Frederick Road with a subsequent use of the hyperlink for United States Postal Service, which led to the street view of 1001 Frederick Road, which is a Post Office in Catonsville, Maryland"

- 29 July 2022: "United States Postal Service, Post Office, Chantilly, Virginia" and "[a]nother search for" the Catonsville Post Office on Frederick Road

- 30 July 2022: "Baltimore County mail lady robbed" and "Baltimore County mail lady robbed 2022"

- 8 August 2022: "Loudon County Post Office" and "Post Office, Chantilly, Virginia"

10

- 17 August 2022: "Post Office near Boca Raton Corporate Center" with "a subsequent hyperlink for . . . 604 Banyan Trail in Boca Raton, Florida, and a street view for that Post Office"

- 31 August 2022: "how often does your Mercedes Benz update its location in the app?" and "mail theft forensics?"

- 9 September 2022: "when police ping your phone is it your exact phone or your SIM?"

- 3 November 2022: "can red light cameras see your face" and "can traffic cameras see inside your car"

- 7 November 2022: "red light intersection cameras" and "red light traffic camera pictures."

Jordan's former attorney testified that Jordan recorded one of their conversations and posted it to Telegram. In the conversation played for the jury, the attorney informed Jordan of Mattocks's "possible testimony" against him under a plea agreement. Jordan responded, "He took five years and he ratted[,]" adding, "He's stupid. Bitch."

In closing, the State argued that the circumstantial evidence established collectively, beyond a reasonable doubt, that Jordan participated in the armed robbery of Fowlkes by following her vehicle, delivering Nichols with a handgun to the site of the crime, and driving the getaway car. In support, the prosecutor pointed out, *inter alia*, that, along with "checks, debit cards, [and] IDs," the evidence recovered from the black GLC abandoned by Jordan "[i]ncluded . . . two other arrow keys with the USPS label on it." Jordan did not offer evidence in his defense.

**LEGAL STANDARDS GOVERNING "OTHER BAD ACTS" EVIDENCE**

Md. Rule 5-404(b) prohibits evidence of other crimes, wrongs, or bad acts to prove character or propensity. In pertinent part, the rule provides that

11

[e]vidence of other crimes, wrongs, or other acts . . . is not admissible to prove the character of a person in order to show action in the conformity therewith. Such evidence, however, may be admissible for other purposes, such as proof of motive, opportunity, intent, preparation, common scheme or plan, knowledge, identity, absence of mistake or accident[.]

Md. Rule 5-404(b).

As this Court explained recently, the

rule makes two things clear: (1) "other bad acts" evidence is *not* admissible to suggest that, because a person is of a particular character, they are more likely to have committed the crime they are on trial for; and (2) "other bad acts" evidence *is* admissible for "other purposes." *Browne v. State*, 486 Md. 169, 187 (2023). The "overarching concern" of the rule is to prevent conclusions that a "defendant is a 'bad person' and, therefore, should be convicted of the charges for which the defendant is on trial for that reason, rather than based on evidence specific to those charges." *Id.* at 187-88 (cleaned up) (quoting *Wynn v. State*, 351 Md. 307, 317 (1998)).

We apply an exclusionary approach when analyzing evidence of other acts under Maryland Rule 5-404(b). *Browne*, 486 Md. at 188-90. In *State v. Faulkner*, our Supreme Court laid out a three-part test for evidence to be excepted from the general exclusionary approach. [*State v. Faulkner*, 314 Md. 630, 634-35 (1989)]. Once again, in order to be admissible: "(1) the evidence must be specially relevant; (2) the defendant's involvement must be proved by clear and convincing evidence; and (3) the necessity for and probative value of the evidence must not be substantially outweighed by the risk of unfair prejudice." *Browne*, 486 Md. at 190 (citing *Faulkner*, 314 Md. at 634-35).

*Crawford v. State*, 265 Md. App. 374, 393-94 (2025) (footnote omitted). *See also Odum v. State*, 412 Md. 593, 610 (2010) (recognizing that "if a jury considers a defendant's prior criminal activity, it may decide to convict and punish him for having a criminal disposition'" and/or "might infer that because the defendant has committed crimes in the past, he is more likely to have committed the crime for which he is being tried" (quotation marks and citations omitted)); *Terry v. State*, 332 Md. 329, 334 (1993) (stating that other

12

crimes evidence "is excluded because it may tend to confuse the jurors, predispose them to a belief in the defendant's guilt, or prejudice their minds against the defendant").

The restrictions in Rule 5-404(b) do "not apply to evidence of crimes (or other bad acts or wrongs) that arise during the same transaction and are intrinsic to the charged crime or crimes." *Odum*, 412 Md. at 611. "Intrinsic" means, "at a minimum, other crimes that are so connected or blended in point of time or circumstances with the crime or crimes charged that they form a single transaction, and the crime or crimes charged cannot be fully shown or explained without evidence of the other crimes." *Id.* Under this theory, "[a]cts that are part of the alleged crime itself (such as acts in furtherance of an alleged conspiracy), or put in its immediate context, are not 'other acts' and thus do not have to comply with Md. Rule 5-404(b)." *Id.* (further quotation marks omitted) (quoting Lynn McLain, *Maryland Evidence, State & Federal* § 404.5 (2009 Supp.)).

Alternatively, other bad acts evidence may be considered to be "specially relevant" and admissible when it "has substantial relevance to a contested issue other than propensity[.]" *Browne*, 486 Md. at 190. As Rule 5-404(b) itself states, evidence may be specially relevant when it relates to "proof of motive, opportunity, intent, preparation, common scheme or plan, knowledge, identity, absence of mistake or accident[.]" Although frequently labeled as "exceptions" to Rule 5-404(b), in practice, these are simply "representative" categories of "other bad acts" evidence that may be admissible when proffered to prove material facts other than character or criminal propensity. *Cf. Hart v. State*, 260 Md. App. 491, 528 n.24 (2024) ("The recognized exceptions to the exclusionary

13

rule are not exclusive, but contain a flexible list of representative examples that continues to expand.").

## DISCUSSION

Jordan contends that the trial court erred in admitting the Other Keys evidence because that information "was not intrinsic to the charged crimes" and did not fall within one of the specified exemptions to Md. Rule 5-404(b). In his view, "the very existence of more than one arrow key clearly told the jury that there were other mail carrier robberies. And since the other arrow keys were found in Jordan's girlfriend's car, known to be driven by Jordan, the jury would easily believe that Jordan committed those other crimes." In particular, the jury, having heard "that one of the other keys 'was reported stolen out of Mc[L]ean, Virginia on May 23rd of 2022'" and "found in the black Mercedes, last driven by Jordan[,]" could have inferred "that Jordan participated in the robbery of a mail carrier in Northern Virginia, or committed some other crime that gained him possession of the key." Moreover, the Rule 5-404(b) exceptions for common scheme and modus operandi do "not fit the facts of Jordan's case" because "there was no evidence of a 'single inseparable plan encompassing both the charged and uncharged crimes[,]'" "the evidence of Jordan's involvement in the Catonsville and Mc[L]ean crimes falls woefully short of clear and convincing[,]" and "the probative value of the evidence was outweighed by its potential for unfair prejudice."

The State counters that "[m]uch of Jordan's appellate claim is not preserved" because he did not dispute the prosecutor's argument "that the [Other Keys] were . . . intrinsic to the charged crimes" or otherwise contend that such evidence falls outside the

14

special relevance exceptions recognized in Rule 5-404(b). Moreover, Jordan did not argue "that the other crime was not established by clear and convincing evidence."

In any event, the State contends, the Other Keys evidence was admitted properly under "the modus operandi exception" in Rule 5-404(b) and, if it was otherwise, it was harmless, given that (1) it "was cumulative of other evidence" linking "Jordan to other possible Post Office related crimes[,]" which was "admitted without objection or not challenged on appeal[,]" and (2) the State only referred briefly to the Other Keys in its closing argument, stating that "[i]ncluded in" various items that police recovered from Jordan's girlfriend's car were "two other arrow keys with the USPS label on it."

Addressing these contentions in turn, and in the three-step framework for deciding whether other bad acts evidence is admissible, we conclude Jordan preserved his Rule 5-404(b) challenge, but that the trial court did not err or abuse its discretion in admitting the Other Keys evidence.

## I. *Jordan preserved his Rule 5-404(b) challenge.*

The State argues that Jordan did not preserve his appellate challenge to the admission of the Other Keys evidence because his trial counsel did not respond directly to the prosecutor's arguments that such evidence was "intrinsic" to the charged crimes; nor did counsel argue otherwise that such evidence "did not fall within one of the rule's exceptions" or "that the 'clear and convincing evidence' standard was not met." "At most," the State contends, Jordan "preserved a claim that the trial court erred in determining that the evidence was relevant and the probative value outweighed the potential for unfair prejudice."

15

Based on our scrutiny of the trial record, we conclude that Jordan preserved his Rule 5-404(b) challenge. A party objecting to the admission of evidence must do so "at the time the evidence is offered or as soon thereafter as the grounds for objection become apparent. Otherwise, the objection is waived. The grounds for the objection need not be stated unless the court, at the request of a party or on its own initiative, so directs." Md. Rule 4-323(a). This requirement applies even after the denial of a motion *in limine*, meaning that an objecting party must reassert the objection whenever the previously challenged evidence is offered into evidence at trial. *See Wimbish v. State*, 201 Md. App. 239, 261 (2011).

Mindful that "[p]reservation for appellate review relates to the issue advanced by a party, not to every legal argument supporting a party's position on such issue[,]" *Smith v. State*, 176 Md. App. 64, 70 n.3 (2007), we consider the full record to determine whether an issue has been raised in a manner that alerts the trial court to the objecting party's grounds for excluding the challenged evidence. For example, a generalized objection based on relevance may not preserve an appellate argument that the challenged testimony was improper "bad acts evidence." *See Klauenberg v. State*, 355 Md. 528, 541 (1999); *Jeffries v. State*, 113 Md. App. 322, 340-42 (1997).

Here, the record shows that Jordan challenged consistently the admissibility of the Other Keys evidence under Rule 5-404(b) on the ground that jurors might infer that he committed other crimes or bad acts to acquire those two stolen arrow keys.[3] Indeed, it was

---

[3] Although Jordan raised concerns about jurors inferring that he committed robberies to acquire the Other Keys, we note that theft, unauthorized possession, and unauthorized use of a USPS arrow key may be federal crimes punishable by up to ten years imprisonment. *See* 18 U.S.C.A. § 1704.

16

defense counsel who, on the second day of trial, raised prophylactically that concern by invoking this rule.

At the outset of proceedings, without the jury present, counsel advised the court that, although "this case is about an arrow key" stolen from Fowlkes and used in the mailbox theft scheme, "[t]he State's going to introduce some photographs this morning" to show that "[i]n one of the Mercedes, the GLC [or] the GLK, there were other arrow keys which would suggest other armed robberies, or robberies from different postal people, not this case." Because "the State hasn't made any motion about 404(b) evidence[,]" defense counsel moved "in limine" to exclude "a photograph of an arrow key that's going to be identified as being stolen either in Baltimore County, or Northern Virginia," arguing that such evidence "should not be allowed in this particular case" because "we're trying an armed robbery of a victim in Howard County."

Opposing that motion, the prosecutor pointed out that "[w]e're also trying a series of thefts that occurred between June of 2022 and August of 2022, and the nature of those thefts involve[s] arrow keys." Although the State alleged that this theft scheme was committed with the arrow key that Jordan and Nichols stole from Fowlkes, Jordan did not admit involvement in either that robbery or those thefts. Mattocks could identify Jordan as his co-conspirator in the theft scheme, but he could not testify that Jordan participated in the armed robbery because he did not meet Jordan until afterward and never discussed how Jordan acquired the arrow key they used. The State did not adduce any evidence, beyond cell phone location data, that put Jordan in the same area as Nichols during the robbery.

17

Given that all but one of the charges against Jordan stemmed from the Fowlkes robbery, the prosecutor emphasized that "[t]his is a circumstantial evidence case." Because "[n]o one's going to identify his face as the person there on June 21st[,]" "each piece is important, including those keys." Although the prosecutor did not have an intention "to get into the specifics of how those specific keys were recovered[,]" including whether "there was an armed robbery case in Virginia," she emphasized that "[w]hat is important is that these are stolen keys from other similar, you know, Post Office – stolen from postal workers." Based on this record, she argued, evidence that two other arrow keys "stolen from postal workers" were found in the black GLC abandoned by Jordan was the "type of evidence" that "is intrinsic among everything that the State is trying to present in this case[.]"

The trial court, balancing the relevance and risks of admitting the Other Keys evidence, ruled that "the keys themselves will not be excluded" because "information" about police recovering them from the black GLC "is relevant." Yet, the judge continued, "in-depth facts into those events, or any other robberies," would not be admitted because it "would be highly prejudicial to go into events of robberies of how those keys were obtained in those other matters."

Defense counsel persisted, objecting on relevance grounds that testimony that one of the keys "opens all the boxes in Baltimore County" would "suggest[] that [Jordan is] involved in crimes other than the one [sic] that he's on trial for here," i.e., the Fowlkes robbery and mailbox thefts in Howard County. Because the Other Keys "wouldn't open up

18

Howard County boxes[,]" defense counsel insisted, "they have zero relevance. And the only thing they could be used for is to suggest that he's involved in other robberies."

The prosecutor, citing *Odum v. State* for its discussion of "intrinsic evidence" that is "impossible to really separate[,]" renewed the State's position that "all of the circumstantial evidence against" Jordan "is how we are proving this case."

The trial court, agreeing with defense counsel that "everything under the sun" could not "come in in regards to those events[,]" ruled again that it would admit only the evidence that police recovered the Other Keys in the black GLC and that both "are stolen keys." Seeking clarification, defense counsel restated his understanding of the rule, that "it can be testified to that the keys found were stolen, but it cannot be talked about what jurisdiction they go to, what boxes they open, that they don't match Howard County, just that they're stolen." The trial court reassured counsel that "[i]f at some point either of you want to revisit that, ask to approach the bench."

The prosecutor proceeded to elicit testimony from the forensic specialist who searched the two vehicles abandoned by Mattocks and Jordan and identified the "two USPS keys which were recovered from the black bookbag in the front passenger seat of the 2022 black Mercedes" GLC. Defense counsel approached the bench to renew Jordan's "same" objection to that testimony and accompanying photos, and to object anticipatorily to admission of the two keys themselves. The trial court overruled the objection, explaining that "the actual keys" were not "more or less prejudicial than the pictures" of them.

Defense counsel then reasserted, for the record, "that we don't abandon our argument that none of this should come in [in] its entirety[.]" The court acknowledged that global objection, stating: "Understood."

The prosecutor proceeded to move into evidence items found in the black GLC. When she reached "Exhibit 19, which are the . . . two keys from the GLC, which are not identified to be involved in the Howard County armed robbery[,]" the trial court recognized defense counsel's continuing opposition, with its limitations stated previously.

The following day, outside the presence of the jury, defense counsel asked the court again to confirm that the State would not ask a detective about investigations of other armed robberies of postal workers, including "a July 1st, 2022, Howard County armed robbery" and "a July 29th Baltimore County armed robbery." The court confirmed its ruling that the prosecution was limited to evidence that the two arrow keys in the black GLC "were stolen keys," but could not "go into other armed robberies[.]"

The prosecutor sought clarification that she would not be prevented from asking about "Google searches" that Jordan did about "robberies of postal workers[,]" arguing that was "not 404(b) evidence, it's intrinsic evidence." Citing *Odum v. State*, the prosecutor argued that such evidence "is all going to his state of mind, it's going to the conspiracy to commit armed robbery." The trial court ruled that "information in regards to searches comes into evidence" but "[r]eferences to charges pending in other matters, specifically about charges, do not come into play."

Based on these numerous challenges by defense counsel, we are satisfied that court and counsel debated whether the Other Keys evidence was admissible under Rule 5-404(b),

as specially relevant circumstantial evidence supporting the State's allegations that Jordan participated in both the Fowlkes robbery with Nichols and the mailbox theft scheme with Mattocks. Regardless of the terms that court and counsel used to debate the admissibility of the Other Keys evidence, the focus was on whether it should be admitted as evidence connecting Jordan to the Fowlkes robbery and the mailbox theft scheme, by identifying Jordan as a participant in those crimes.

This was sufficient to preserve Jordan's Rule 5-404(b) challenge for appellate review. As this Court explained,

> [t]he label does not really matter when the labels are frequently but different ways of saying the same thing. "A rose by any other name . . . ." What matters is that the evidence of the "other crimes," however it might be categorized or labeled, enjoyed a special or heightened relevance in helping to establish the identity of the appellant as the perpetrator of the crimes on trial.

*Oesby v. State*, 142 Md. App. 144, 163 (2002). Because the record shows that defense counsel objected timely and repeatedly to the Other Keys evidence, we are satisfied that Jordan preserved his Rule 5-404(b) opposition to such evidence on the grounds now argued on appeal. *See Smith*, 176 Md. App. at 70 n.3.

## II. The Other Keys evidence had special relevance to the contested issue of identity, as evidence of Jordan's motive for the robbery, and modus operandi for the theft scheme.

Jordan contends that the trial court erred in admitting the Other Keys evidence because it "was not intrinsic to the charged crimes" and fails all three elements of the *Faulkner* standard for admitting other crimes and bad acts evidence under Rule 5-404(b). "In other crimes evidence issues, as to whether a matter fits within an exception in the first instance, we extend no deference to a trial court's decision." *Wynn*, 351 Md. at 318.

21

Although we agree with Jordan that the challenged evidence was not admissible under an intrinsic evidence theory, we conclude that it was admitted properly as specially relevant evidence to show his motive and modus operandi of Jordan's identity, both as Nichols's accomplice in the Fowlkes robbery and as Mattocks's accomplice in the mailbox theft scheme.

### A. Whether the Other Keys evidence was "intrinsic" to the charged crimes depended on whether it was specially relevant under Rule 5-404(b).

Jordan contends that the Other Keys evidence was not admissible as evidence that was "intrinsic" to the Fowlkes robbery and theft scheme under the standard recognized in *Odum*, 412 Md. at 611, because it was not "so connected or blended in point of time or circumstances with the" Fowlkes robbery and mailbox thefts that those charged crimes "form a single transaction, and . . . cannot be fully shown or explained without evidence of" these Other Keys. In contrast to *Odum*, he argues, the robbery and theft crimes charged against him were "readily contained, each within its own narrative" and can "be fully shown or explained without evidence" that police, in addition to recovering the Fowlkes Key in the silver GLK abandoned by Mattocks and Jordan after they fled from police on 31 August 2022, also recovered two other stolen arrow keys inside the black GLC Jordan abandoned that night. In Jordan's view, admitting the Other Keys evidence, which was connected to "criminal incidents in Northern Virginia and Catonsville," not "the crimes charged in the indictment," was not necessary for the State to present "a complete and coherent narrative of the events surrounding the robbery of Ms. Fowlkes and the mailbox thefts that flowed from that robbery."

22

The State does not address directly whether the Other Keys evidence is admissible as "intrinsic evidence" under *Odum*, arguing instead that Jordan did not preserve this challenge because defense counsel did not respond to the prosecutor's arguments that the Other Keys evidence was "intrinsic" and therefore not covered by Rule 5-404(b). As we have explained previously, however, Jordan challenged clearly and consistently the admissibility of the Other Keys evidence under Rule 5-404(b), on grounds that those keys and the underlying thefts were not connected by either place, time, or circumstances to the Fowlkes robbery and mailbox thefts.

We agree with Jordan that the Other Keys evidence does not fit neatly into the intrinsic evidence theory applied in *Odum* because it was not "so connected" to the Fowlkes robbery and mailbox thefts that those charged crimes "form a single transaction" that "cannot be fully shown or explained without evidence of" these Other Keys. *See Odum*, 412 Md. at 611. Odum was convicted of kidnapping, but acquitted of assault, robbery, and murder charges against two victims. *See id.* at 596. After he obtained a new trial on appeal, the court admitted evidence at the second trial that the two victims were assaulted and robbed in a parking lot, kidnapped, driven to another location, and murdered. The Supreme Court held that admitting evidence of those assaults, robberies, and murders did not violate Rule 5-404(b) because "the strictures of 'other crimes' evidence law . . . do not apply to evidence of crimes (or other bad acts or wrongs) that arise *during the same transaction and are intrinsic to the charged crime or crimes*." *Id.* at 611 (emphasis added). *Cf. Dixon v. State*, 133 Md. App. 325, 330 (2000) ("What we have in this case is evidence essentially integral to, even if not literally inextricable from, the criminal incident on trial[,]" which

23

"in earlier decades . . . would have been felicitously referred to as part of the *res gestae* of the crime."), *rev'd on other grounds*, 364 Md. 209 (2001); *Smith v. State*, 232 Md. App. 583, 600 (2017) (recognizing "that if an act is part of the alleged offense, the act does not constitute an 'other' act to which the rule applies").

In those circumstances, the other crimes of assault, robbery, and murder were so connected in the timeline of events that occurred during a continuing criminal transaction that the kidnappings could not be proved without evidence of the crimes that immediately preceded and followed them. *See Odum*, 412 Md. at 611. Because Odum was on trial for kidnappings that were continuing crimes, book-ended by robbery and murder, both the charged crimes and the other crimes were part of a single, continuous criminal transaction, so that the kidnappings could not be presented to the jury without placing them into the temporal and circumstantial context of that robbery-kidnapping-murder timeline of events. *See id. Cf. Dixon*, 133 Md. App. at 331 (characterizing assault victim's testimony that he previously purchased drugs from defendant as admissible "direct evidence as to why [the victim] stopped the car and approached the appellant" because without "knowledge that the appellant was someone from whom he could purchase 'more crack,'" the victim's "entire narration of the incident that morning would have been unintelligibly bizarre").

Here, in contrast, evidence that Jordan had two other stolen arrow keys in his car was not "so connected or blended in point of *time*" to the Fowlkes robbery and mailbox thefts that those crimes "form a single transaction, and . . . cannot be fully shown or explained without evidence of" the Other Keys. *See Odum*, 412 Md. at 611 (emphasis added). Rather, the State's theory was that the Other Keys evidence was "so connected or

24

blended *in point of . . . circumstances* with the" Fowlkes robbery and mailbox thefts, that those charged crimes "cannot be fully shown or explained without evidence of" these Other Keys. *See id.* (emphasis added).

Viewed in the context of this record, we are not persuaded that this appeal turns on the outcome of a debate over whether the Other Keys evidence was "intrinsic" to the robbery and theft scheme within the scope of *Odum* and its progeny. Although we doubt that such evidence was intrinsic within the concept applied in *Odum*, we recognize that the parties' arguments for and against admitting the Other Keys evidence under Rule 5-404(b) asked whether it was specially relevant to the identity issue at the heart of this case: whether Jordan participated in both the robbery and the theft scheme. *Cf. Freeman v. State*, 259 Md. App. 212, 256 (2023) ("Whether or not [the challenged text messages] were intrinsic to the crime itself, and we are not certain they were, we are persuaded that they were specially relevant and met the test for the admission of other crimes or bad acts evidence under Rule 5-404(b)."). As we have explained, the Other Keys evidence was proffered and admitted as circumstantial evidence connecting Jordan to the Fowlkes robbery and mailbox theft scheme by making it more likely that he possessed those two other stolen arrow keys, that he was Nichols's accomplice in robbing Fowlkes in order to obtain her arrow key, and that he was Mattocks's accomplice in the mailbox thefts using that key. Accordingly, we address whether the Other Keys were specially relevant.

> **B. The Other Keys evidence was specially relevant to prove Jordan's identity as Nichols's accomplice in the Fowlkes robbery and as Mattocks's accomplice in the mailbox theft scheme.**

Jordan contends that the State cannot meet its burden of establishing that the Other Keys evidence was admissible under one of the established exceptions for specially relevant evidence in Rule 5-404(b) because the only "plausible" one in these circumstances "would be the 'common scheme or plan[,]'" which "does not fit the facts of Jordan's case." The State counters that the Other Keys had special relevance "as evidence of modus operandi that showed identity of the perpetrator" because the discovery of two other stolen arrow keys in the black GLC abandoned by Jordan, following a mailbox theft using the Fowlkes Key that was recovered from the silver GLK in which he was a passenger, "made it at least somewhat more likely that Jordan was involved in the robbery and thefts of checks using an unusual device, an arrow key, than if no arrow keys had been found in a location linked to him." In support, the State relies on the "unusual way" that Jordan "'defeat[ed]' a locked Post Office box" with "a key that is properly carried only by federal employees[,]" in order "to steal things that legally have no value to anyone other than the person whose name is on it, checks[,]" and then to sell those checks to buyers through an anonymous online platform.

"With respect to the admission of 'bad acts' or 'other crimes' evidence, we [conduct] plenary review [of] the legal determination of whether the challenged evidence meets a 'special relevance' exception." *Wilder v. State*, 191 Md. App. 319, 335 (2010) (citing *Streater v. State*, 352 Md. 800, 809 (1999)). *See Marshall v. State*, 213 Md. App. 532, 546 (2013). At trial, court and counsel debated whether the Other Keys evidence should be admitted to show that Jordan's theft scheme relied on a signature device – an arrow key – that he acquired by robbing mail carrier Fowlkes. As the prosecutor argued,

26

and the trial court agreed ultimately, "[w]hat is important is that these are stolen keys . . . – stolen from postal workers." The State invoked the Other Keys evidence in closing, as evidence that arrow keys were Jordan's "M.O." – a modus operandi using signature tools that identified him as Mattocks's accomplice in the mailbox theft scheme and Nichols's accomplice in the Fowlkes robbery.

Mindful that "'other crimes' evidence does not have to fall neatly into one particular exception and be admitted for one purpose[,]" so that "[t]he label we put on . . . is not that important," we examine whether the Other Keys evidence has "a special or heightened relevance and has the inculpatory potential to prove something other than that the defendant was a 'bad man.'" *Page v. State*, 222 Md. App. 648, 663 (2015) (cleaned up). Here, "[w]hat matters is that the evidence of the 'other crimes,' however it might be categorized or labeled, enjoyed a special or heightened relevance in helping to establish the identity of the appellant as the perpetrator of the crimes on trial." *Oesby*, 142 Md. App. at 163.

For reasons that we shall elaborate, we agree with the trial court that the Other Keys evidence was specially relevant to prove Jordan's identity, by establishing his motive for the robbery and his modus operandi for the mailbox theft scheme.

### 1. The identity of Nichols's accomplice in the Fowlkes robbery and Mattocks's accomplice in the mailbox thefts was contested.

At trial, identity was the primary issue because every charge (but theft) depended on the State proving that Jordan participated in the Fowlkes robbery. As the State emphasized throughout trial, the robbery charges were predicated entirely on circumstantial evidence. Jordan's defense was that the State could not prove, beyond a

reasonable doubt, that he drove the Impala, given that there was no eyewitness, photographic or forensic evidence, or accomplice testimony bearing on that point. Indeed, the record shows that Fowlkes did not see anyone other than the gray-haired robber who stole her arrow key at gunpoint. Surveillance images did not capture an identifiable image of the driver of the vehicle in which the robber (a passenger), later identified as Nichols, fled; nor did Nichols incriminate Jordan.[4]

Although Mattocks testified that Jordan possessed the Fowlkes Key when they met shortly after the Fowlkes robbery, and that Jordan kept that key throughout their mail theft spree, the uncorroborated testimony of an accomplice and co-conspirator would not be sufficient ordinarily to convict Jordan. *See generally State v. Jones*, 466 Md. 142, 151 (2019) (recognizing that, under "[t]he accomplice corroboration rule[,] . . . the State must present independent corroboration of accomplice testimony to sustain a conviction" because "accomplices may lie to protect themselves"). Likewise, even though the "[u]nexplained possession of recently stolen goods gives rise to an inference that the possessor is the thief[,]" *Molter v. State*, 201 Md. App. 155, 171 (2011) (cleaned up), the evidence as to whether Jordan possessed the Fowlkes Key was disputed and somewhat equivocal.

Mattocks did not meet Jordan until after the Fowlkes robbery. Although Mattocks testified that Jordan had then the stolen Fowlkes Key in his possession, Jordan never told him how he obtained that key, which both Mattocks and the primary detective testified

---

[4] At trial, HCPD Detective Usher testified that Nichols pleaded guilty to robbery with a deadly weapon in this case.

28

could have been purchased on Telegram. Moreover, that arrow key was recovered from the silver GLK driven by Mattocks, who admitted that he used it to steal from mailboxes (without Jordan) and that he pleaded guilty to armed robbery of a postal worker in Baltimore County. Mattocks testified under a plea agreement that Jordan was his passenger in the silver GLK when it was abandoned, but there was no photographic or eyewitness evidence to corroborate that. Although forensic evidence established that Jordan's fingerprints were on the window next to where the Fowlkes Key was found, police could not establish when that print was made and had no other forensic or circumstantial evidence that Jordan handled the Fowlkes Key itself.

In closing, defense counsel argued to the jury that "this whole case is about who drove that car[,]" and then pointed out that Mattocks pleaded "guilty to the armed robbery of a Postal Worker," that the State did not present any visual evidence identifying Jordan as the driver, and that police did not look for prints or DNA on the arrow key stolen from Fowlkes. Counsel suggested that the prosecution strategy was to "make Teshan Jordan look like the worst person" so "[t]he jury will hate him and they'll convict him" based on social media images and cell phone data showing him "being flashy and . . . making fun of people that work 40 hour weeks[.]"

### 2. The Other Keys evidence was probative of Jordan's identity by establishing his motive for the Fowlkes robbery.

"Evidence that shows that a particular person has a motive to commit an act also tends to identify that person as the perpetrator." 5 McLain, *Maryland Evidence, State & Federal* § 404:11 (2025) ("*Maryland Evidence*"). For example, in *Wilder*, 191 Md. App.

29

at 344, testimony that the defendant threatened previously to come to a shooting victim's house with a weapon was admissible to prove both the defendant's identity as the shooter and his motive for revenge. Similarly, in *Crawford*, 265 Md. App. at 395-96 (cleaned up), evidence that the defendant set eight fires was admissible to prove identity and motive where he "had a list of names on his computer and everybody whose house got burned [their] name[s] appeared on that list" and "was acquainted with Mr. Crawford but could only recall seemingly inconsequential grievances with him." *See also Freeman*, 259 Md. App. at 256 (holding that text messages were admissible to show "preparation and his motive and intent to obtain a handgun to commit a robbery").

More specifically, evidence that an individual had a financial motive to commit the charged crime may be admissible to identify him as the perpetrator. In *Molina v. State*, 244 Md. App. 67, 133-35 (2019), evidence that the defendant and co-defendant had gambling debts was admissible to show their motive for theft, where their gambling losses coincided with withdrawals from the victim's bank account. And in *Wagner v. State*, 213 Md. App. 419, 459-60 (2013), "the circuit court properly determined that the evidence of appellant's post-crime drug use was admissible to show appellant's motive for robbing the victim, i.e., to obtain cash and drugs."

The State, acknowledging a need to adduce circumstantial evidence to prove Jordan's identity as Nichols's accomplice in the Fowlkes robbery and Mattocks's accomplice in the mailbox thefts, proffered the evidence that police found two other unique arrow keys that had been stolen inside the black GLC that Jordan abandoned in the grocery store parking lot when he and Mattocks fled from police. We conclude that evidence of the

30

Other Keys was probative of identity because the presence of two stolen arrow keys in the black GLC abandoned by Jordan made it more likely that Jordan, not Mattocks, was the common denominator between the robbery and the theft scheme, with a financial motive to obtain Fowlkes's arrow key to use in his mailbox theft scheme.

### 3. *The Other Keys evidence was also probative of Jordan's identity by establishing his modus operandi for the mailbox theft scheme.*

Evidence may be specially relevant also when it establishes a common scheme or plan, either (1) by proving "a *modus operandi*," or (2) as "a plan to commit one offense as part of a grand scheme to commit others[.]" *McKinney v. State*, 82 Md. App. 111, 124 (1990). Modus operandi or "signature crime" evidence is generally admissible to "identify[] a defendant who claims that he was not the person who committed the" charged crimes, *Browne*, 486 Md. at 194 (cleaned up), by showing that the accused "used an unusual way of" committing prior offenses, "and the same method was used by the perpetrator of the crime with which he is charged[.]" *Maryland Evidence* § 404:11. The other acts in question must be "so nearly identical in method as to earmark them as the handiwork of the accused." *Browne*, 486 Md. at 195 (cleaned up). *See Faulkner*, 314 Md. at 638-39. The critical component is *not* that the defendant committed previously another similar crime, but that he or she used a distinctive "device" or technique to do so. *See Browne*, 486 Md. at 195. It is required that the "'device . . . must be so unusual and distinctive as to be like a signature.'" *Id.* (emphasis omitted) (quoting *Faulkner*, 314 Md. at 638).

"[When] establishing whether a group of activities qualifies as a modus operandi, a court may consider each characteristic of the method used as a whole, even if when considered separately as unrelated parts, the individual characteristics might appear unremarkable." *Hart*, 260 Md. App. at 528. "For example," Professor McLain explains, "if the defendant is charged with housebreaking by cutting through a window screen, entering the house, and stealing silver flatware, proof that he had committed the same type of crime before is inadmissible to prove identity." *Maryland Evidence* § 404:11. In contrast, "if on the prior occasions he had used an unusual way of defeating a burglar alarm, and the same method was used by the perpetrator of the crime with which he is charged, the evidence may be admitted as proof of his identity as the perpetrator." *Id.*

In *Browne*, the Supreme Court summarized cases admitting "other bad acts" evidence to prove identity through a distinctive method of operation:

> Evidence regarding a *modus operandi* should be considered as a whole, instead of as a set of unrelated parts. Thus, features of a crime that may be ordinary when considered alone can still establish a *modus operandi* when considered in combination. [*S*]*ee also Garcia-Perlera v. State*, 197 Md. App. 534, 548-49 (2011) (finding a *modus operandi* among four home invasions within a year of elderly women living alone, each within walking distance of the other, on weekdays between Monday and Wednesday, all gagged and "hog-tied," with three of the victims detained in their basements); *Oesby v. State*, 142 Md. App. 144, 155-57 (2002) (finding a *modus operandi* among four attacks over the course of nine days on women living near each other in the common areas of their apartments where the attacker approached the victims in a friendly manner before raping them while wielding a knife with specific characteristics); *Moore* [*v. State*, 73 Md. App. 36, 42-44, 47-48 (1987)] (finding a *modus operandi* where three women were attacked within a month of one another, all crimes occurred between 11:45 a.m. and 1:30 p.m., the assailant in all demanded or took jewelry from the victim's purse, all three occurred near the same Metro station, all victims were choked, and in all, the attacker initiated the encounter by showing the victims a photo and asking for directions).

32

On the other hand, simply showing common elements of charged and uncharged crimes is insufficient; the common elements must mark the offenses as sufficiently consistent and extraordinary as to indicate that they must both have been undertaken by the same individual. Thus, for example, in [*McKnight v. State*, 280 Md. 604 (1977)], we found insufficient evidence of a *modus operandi* where four victims of different robberies that occurred within a one-month period were all men living alone in the same neighborhood, in a thickly populated urban area, and three of the men had their pants ripped during the crimes. 280 Md. at 613-14. We explained that the similarities among the crimes were not sufficiently distinctive to amount to a *modus operandi*. Instead, such similarities fit into an obvious tactical pattern which would suggest itself to almost anyone disposed to commit a depredation of this sort.

*Browne*, 486 Md. at 195-96 (cleaned up).

*Faulkner*, 314 Md. at 636, is instructive of when a distinctive robbery may be admissible to identify the defendant as the perpetrator. In that case, the defendant was charged with robberies at a Safeway. The trial court did not err in admitting evidence of two earlier robberies at the same store because the robber in all three incidents had the same physical characteristics, wore gloves and a mask cut out from denim jeans, jumped on the check-out counter, and demanded bills in large denominations. *Id.* The Supreme Court held that, even though each isolated piece of evidence was unremarkable, taken together, they were admissible as evidence of "identity" through a particular modus operandi. *Id*. at 639-40. *Cf. Nasim v. State*, 34 Md. App. 65, 77-78 (1976) (holding evidence that prior fire and charged fire were started by same distinctive means – an iron left on an ironing board – was sufficient "to earmark it as the handiwork of the accused" (cleaned up)).

33

In contrast to *Faulkner*, the Supreme Court in *Browne* rejected the State's contention that evidence regarding the deaths of two young children established a "signature" method of killing because both victims were

> preverbal babies who could not tell adults about their abuse; each was the youngest of multiple siblings; each died following one of the only occasions they had been left alone with Mr. Browne; each died of blunt force trauma; and Mr. Browne blamed the victims' older siblings after each death.

*Browne*, 486 Md. at 197. The Court held that these similarities did not support an inference "that the same person probably committed both crimes." *Id*. at 198 (cleaned up). Because such evidence did "not involve close proximity of location and time, matching descriptions of the perpetrator, or the repeated use of a particular method of committing the crime[,]" the fact that "the charged crime and the prior crime were committed against similar victims, apparently in a similar manner, six years apart" did not make them "so nearly identical in method as to earmark them as the handiwork" of a singular perpetrator or "so unusual and distinctive as to be like a signature." *Id*. (cleaned up).

We agree with the trial court that using an arrow key stolen from a USPS mail carrier to steal repeatedly from mailboxes along the postal route linked to that key constitutes a sufficiently distinctive modus operandi to constitute earmarked or signature crimes. As the State points out, "[c]ase law shows how 'unusual' using an arrow key" to commit mailbox thefts is.[5] Here, the jury could infer from the presence of two stolen arrow keys in the black

---

[5] Although the State reports that "there are only about 44 opinions (reported or unreported) that use the term 'arrow key' to refer to a key used by a Post Office employee[,]" we found no Maryland case mentioning the term "arrow key" in this context. Moreover, we have not been directed to any decision addressing the admission of arrow

(continued…)

GLC that Jordan left in the parking lot, and the Fowlkes Key on the floor next to where Jordan was sitting when he and Mattocks abandoned the silver GLK while fleeing from police, that Jordan "possessed" the distinctive tools used in all the Howard County mailbox thefts.

### 4. The Other Keys evidence was specially relevant to identify Jordan as Nichols's accomplice in the Fowlkes robbery and Mattocks's accomplice in the theft scheme.

Proving "that the accused had a motive or plan to commit a crime, or used the same distinct signature in another crime that was present in the charged crime, can allow the secondary inference that it is more likely that the accused, and not someone else, committed the charged crime." *Browne*, 486 Md. at 208 (citing *Cross v. State*, 282 Md. 468, 477 (1978)). We agree with the trial court that evidence police found two other stolen arrow keys in the black GLC was specially relevant to prove that Jordan participated in both the Fowlkes robbery and the mailbox thefts.

As the prosecutor pointed out, the State's case against Jordan rested entirely on circumstantial evidence because there was no direct evidence that Jordan was involved in the Fowlkes robbery and only an accomplice's account that he was involved in the theft scheme. The evidence that police recovered two other stolen arrow keys in the black GLC supported a series of inferences that connected Jordan to the Fowlkes robbery and the ensuing mailbox thefts.

---

keys under identity, motive, modus operandi, or any other special relevance exception under an "other crimes" evidentiary rule like Md. Rule 5-404(b).

35

The presence of the Other Keys in the vehicle abandoned by Jordan in the grocery store parking lot supported an inference that he possessed those keys, which in turn made it more likely that (as Mattocks testified) he possessed also (at least jointly) the Fowlkes Key that was recovered next to the passenger seat in Mattocks's silver GLK, where Jordan was sitting when they fled from police and abandoned that vehicle. In turn, Jordan's inexplicable possession of three stolen arrow keys made it more likely that he used the Fowlkes Key to steal mail from collection boxes, between June 21 and 31 August 2022, more likely that he participated in the armed robbery of Fowlkes in order to obtain that arrow key, and more likely also that he was the driver of the Impala who followed Fowlkes, dispatched Nichols to steal her arrow key at gunpoint, and drove the getaway car.

### 5. *Jordan's reliance on <u>Cross</u> and <u>Jones</u> is misplaced.*

We are not persuaded by the two "common scheme or plan" cases that Jordan cites as "controlling here." To the contrary, stark contrasts in the present facts, from those in the cases, support the result here.

In *Cross*, the defendant was charged with a Howard County burglary in which a diamond ring was stolen and later recovered from his blue car. 282 Md. at 470. Over defense objection, the trial court admitted evidence regarding his involvement in a separate Baltimore County break-in. *Id.* at 475-76. The Supreme Court reversed, explaining that evidence that Cross's blue car "was seen in front of two residences where break-ins occurred, is clearly inadequate to show any kind of systematic scheme or plan sufficient to allow admission of the evidence of the other crime." *Id*. at 476.

36

The crux of *State v. Jones*, 284 Md. 232 (1979), was whether the trial court erred in trying three co-defendants together for unsuccessful attempts to rob a bank and a pharmacy before one of them robbed and murdered a liquor store owner. "[T]o establish the existence of a common scheme or plan," the Court explained, "it is necessary to prove that the various acts constituting the offenses naturally relate to one another by time, location, circumstances and parties so as to give rise to the conclusion that they are several stages of a continuing transaction." *Id*. at 243. In that case, however, the evidence established that each target "was selected at random or on impulse and that only after one robbery was attempted was a decision made to rob another place." *Id*. at 244. The Supreme Court held that neither "mere proximity in time and location within which several offenses may be committed[,]" nor "the fact that the offenses were committed by the same persons" would "qualify" admitting such other crimes evidence under the common scheme exception. *Id*. at 243. Absent any "evidence which showed that in advance of the robberies Jones, Johnson and Miller had agreed that they would commit more than one robbery or that they would keep robbing until they obtained enough[] money to buy drugs[,]" there was no common plan or scheme. *Id*. at 244.

In Jordan's view, these two decisions require reversal here because, "[a]s in *Cross* and *Jones*, there was no evidence of a 'single inseparable plan encompassing both the charged and uncharged crimes.'" He argues that "[t]he evidence for common scheme here is far weaker" than in *Jones* because, "[w]hile superficially similar, each of these three criminal episodes" involving the arrow keys "is independent of the other two" given that this case concerns "three different armed robberies of mail carriers, in three separate places

37

and on three different dates, in three separate jurisdictions, which may or may not have been committed by the same three men."

We do not find the analysis in *Cross* or *Jones* persuasive in Jordan's case. Neither case considers the Rule 5-404(b) exemptions for evidence of identity based on motive and modus operandi. Traveling in one's own car to the site of two break-ins is hardly the "signature" equivalent of using a unique arrow key stolen from a USPS mail carrier to conduct multiple thefts from locked mailboxes over the course of weeks. In contrast to a parked blue car, these "devices" are so unavailable to the public, given their unique serial numbers and protective USPS protocols, that Jordan's possession of two stolen arrow keys in his black GLC made it more likely that he possessed also (at least jointly) the stolen Fowlkes Key found in the silver GLK he and Mattocks abandoned, that he and Mattocks used the Fowlkes Key to commit the mail theft scheme for which he was on trial, and that his motive for the Fowlkes robbery was to obtain that arrow key.

Likewise, in contrast to the opportunistic crime spree in *Jones*, the Fowlkes robbery and mailbox theft scheme were neither spontaneous nor random. Although not necessary given the motive and modus operandi predicates for admission, the evidence could support also a common inference that there were "several stages of a continuing transaction" in that the robbers targeted Fowlkes, following her from the Oak Hall Post Office, and coordinating their roles as gunman and getaway driver. These mailbox thieves planned their crimes in advance, rendezvousing on their cell phones and in their cars, targeting multiple mailboxes along the specific mail route that could be opened with the stolen Fowlkes Key, over the course of seven or eight nights.

38

### C. The evidence that Jordan possessed the other stolen arrow keys found in the black GLC was clear and convincing.

The second step in the Rule 5-404(b) analysis is to determine whether the State established Jordan's involvement in the prior bad acts by clear and convincing evidence. *See Faulkner*, 314 Md. at 635. Jordan contends that "the evidence of [his] involvement in the Catonsville and Mc[L]ean crimes falls woefully short of clear and convincing." Without addressing directly this step in the Rule 5-404(b) admissibility analysis, the State asserts that Jordan's failure to challenge the sufficiency of the evidence in the trial court forecloses his appellate complaint.

In our view, Jordan misunderstands this standard as requiring the State to prove by clear and convincing evidence that he committed other robberies and/or thefts. To the contrary, the trial court *prohibited* expressly the prosecutor from eliciting any evidence about the robberies connected to those two Other Keys, restricting instead the State to establishing that they were stolen arrow keys found in the black GLC occupied by Jordan.

The State satisfied that requirement. Jordan did not dispute the crime scene specialist's testimony that both arrow keys were recovered from the black GLC after it was abandoned in the grocery store parking lot on 31 August 2022. Jordan did not dispute the postal inspector's authentication of them as stolen arrow keys. When the prosecutor asked the USPIS inspector what she knew about the Other Keys, Winters testified that the one with a legible serial number was stolen during a May 2022 robbery in Virginia. Although the serial number of the second arrow key was smudged, it was also marked USPS. Moreover, Jordan's possession of those keys was otherwise illegal. *See* 18 U.S.C.A. §

1704. Finally, Jordan did not dispute the evidence from digital tracking and Mattocks's account of the episode that he drove the black GLC on 31 August 2022, when it was abandoned in the parking lot after he and Mattocks fled from police in the silver GLK. Based on this record, the jury could find by clear and convincing evidence that Jordan possessed the two stolen arrow keys in the black GLC.

### D. The Other Keys evidence was more probative and necessary than unfairly prejudicial.

The third and final step in our Rule 5-404(b) analysis is to weigh "'the necessity for and probativeness of the evidence concerning the collateral criminal act against the untoward prejudice which is likely to be the consequence of its admission.'" *Faulkner*, 314 Md. at 640-41 (emphasis omitted) (quoting *Cross*, 282 Md. at 474). "This segment of the analysis implicates the exercise of the trial court's discretion[,]" *id.* at 635, "requir[ing] . . . a Rule 5-403 balancing" because, "[t]o some degree, all evidence admitted under Maryland Rule 5-404(b) is prejudicial." *Cousar v. State*, 198 Md. App. 486, 516 (2011).

We review such balancing "of probative value against the danger of unfair prejudice for an abuse of discretion[,]" *Browne*, 486 Md. at 194, reserving reversal for the "rare and bizarre exercises of discretion that are, in the judgment of the appellate court, not only wrong but flagrantly and outrageously so." *Cousar*, 198 Md. App. at 517-18 (cleaned up). Our concern is whether admission of the challenged evidence will unfairly prejudice the defendant by elevating "the incremental tendency of the evidence to prove that . . . [he] was a 'bad man.'" *Id.* at 516 (cleaned up). If the other crimes evidence presents only a risk of "'legitimate prejudice,'" the State should not be "'constrained to forego relevant

40

evidence and to risk going to the fact finder with a watered down version of its case.'" *Id*. at 517 (quoting *Oesby*, 142 Md. App. at 166).

In *Odum*, for example, evidence that the defendant participated in assaults, robberies, and murders that occurred during the criminal episode that included the kidnapping "was highly probative of his complicity in the charged kidnappings[.]" *Odum*, 412 Md. at 615. Although the evidence of those book-ending crimes "surely prejudiced" the accused, the Supreme Court was "not persuaded that it *unfairly* prejudiced him, much less that the prejudice 'substantially outweighed' the probative value of the evidence." *Id.*

Here, although its ruling was indiscernible in part, the trial court stated that the "prejudicial value" of the Other Keys evidence "is weighed by the moment the witness" testified about "what the keys remain specific to, . . . implying that they came from other thefts, but not the incidents of robbery in regards to other crimes." Recognizing the need to limit the Other Keys evidence to the information that two other stolen arrow keys were found in the black GLC abandoned by Jordan, the court ruled that the probative value of the Other Keys was not outweighed substantially by any unfair suggestion that Jordan "is a bad person 'who should be punished regardless of his or her guilt of the charged crime," or that he committed the robbery and thefts "due to a criminal disposition." *Woodlin v. State*, 484 Md. 253, 265 (2023) (cleaned up). We discern no abuse of discretion in that determination because the Other Keys evidence supported the ultimate identity inference argued by the State – that Jordan was the common denominator between the Fowlkes robbery and the mailbox thefts, who committed the armed robbery of Fowlkes with Nichols

in order to obtain the arrow key he used to commit mailbox thefts with Mattocks.[6] *See Browne*, 486 Md. at 193.

### E. The trial court properly exercised its discretion in admitting the Other Keys evidence.

Jordan preserved his "other crimes or bad acts" objection to the Other Keys evidence by moving to exclude it under Md. Rule 5-404(b) and renewing that objection whenever that evidence was introduced at trial. The trial court did not err or abuse its discretion in admitting limited evidence that police recovered two other stolen arrow keys in the black GLC linked to Jordan, to prove his motive for the robbery and modus operandi for the theft scheme.

**JUDGMENT OF THE CIRCUIT COURT FOR HOWARD COUNTY AFFIRMED. COSTS TO BE PAID BY APPELLANT.**

---

[6] Based on our resolution of the appeal, we do not address the State's harmless error argument that "the contested evidence was cumulative of other evidence suggesting a connection between Jordan and other robberies or thefts."